## STÖHR v. WALLACE et al.

(District Court, S. D. New York. April 21, 1920.)

1. War ⚙️12—Jurisdiction sustained under statute not claimed.

Where the bill to recover property seized by the Alien Property Custodian set forth a claim to the property by a naturalized citizen previously filed with the Custodian, the jurisdiction of the court over the bill can be sustained, under Trading with the Enemy Act, § 9 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e), though plaintiff erroneously claimed jurisdiction for the court under Judicial Code, §§ 24, 57 (Comp. St. §§ 991, 1039).

2. War ⚙️12—Custodian's seizure of property as enemy's determines right to possession, but not ownership.

A seizure of property by the Alien Property Custodian, under direction of the President, settles the Custodian's right to possession of property, under Trading with the Enemy Act, § 7e (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½d), but does not determine the ownership thereof, and a claim may be filed by a resident friend, and subsequently suit brought to recover the property, under section 9 (section 3115½e).

⚙️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. War ⬅═12—Court can prevent sale by Custodian pending determination of friendly claim.

Though Trading with the Enemy Act, § 12, as amended (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff), gives the Alien Property Custodian general power to sell property seized by him, a suit to recover such property by a friend, if it does not automatically stay a sale, authorizes the court to stay the sale under section 9 (section 3115½e) of that act.

4. Constitutional law ⬅═319—Right to seize property as enemy property subject to claim of friendly owner is valid.

The provision of Trading with the Enemy Act, § 7c (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½d), authorizing the Alien Property Custodian to seize property he determines to be enemy owned, without the right to claimant friend to have his claim determined before seizure, is not unconstitutional, in view of the right of such claimant to bring suit under section 9 (section 3115½e) of that act to have his claim determined, which protects all his substantial rights and merely provides a different procedure.

5. War ⬅═12—Dry trustees for aliens cannot object to transfer of title to Custodian.

Citizens, who held corporate stock as dry trustees for the alien owners, cannot object to the transfer of the title of such stock on the books of the corporation to the Alien Property Custodian, after seizure by him of all the interest of alien owners therein.

6. War ⬅═12—Option by enemy to sell stock to domestic corporation held not to defeat seizure.

A contract was entered into shortly before the declaration of war with Germany, whereby German owners of corporate stock agreed to sell their stock for five annual payments, each to be determined by the book value of the tangible assets of the corporation the preceding year. The contract also provided that the failure to make any payment should not affect title to stock already transferred for previous payments, and gave merely option to purchase the stock. Such contract was manifestly not a commercial transaction, since it disregarded good will as an element of value, and was shown by the declarations and letters of the purchasers to be intended to prevent loss of control of the corporation by the incapacity of the alien owners to vote their stock, and to be made with no intention to avoid confiscation, which was not anticipated. *Held*, the contract did not prevent the Alien Property Custodian from acquiring title to the stock by seizure of all the interest therein belonging to the alien enemies.

7. War ⬅═12—Sale in transitu to avoid capture is void.

A sale to a neutral of goods in transitu, made to avoid loss by capture of the goods, is void, as a fraud on belligerent rights.

8. War ⬅═12—Enemy character of goods determined at outset of voyage.

The enemy character of goods shipped by sea is determined by their ownership at the outset of the voyage.

9. War ⬅═12—Sale of enemy property on land before declaration of war to avoid confiscation is valid.

Since the right to confiscate enemy property on land was not generally recognized by the law, but exists solely by virtue of the Trading with the Enemy Act, section 7b of which (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½d) denies to any person any rights acquired by assignment of a chose in action by alien enemy, unless such assignment was made prior to the beginning of the war, an assignment of corporate stock which, though not technically a chose in action, is property of a similar nature, made before the declaration of war, even with intent to avoid confiscation, was valid as against the Alien Property Custodian.

---

⬅═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Bill by Max W. Stöhr, suing in his own behalf as a stockholder in Stöhr & Sons, Incorporated. and in behalf of all others similarly situated, against James N. Wallace and others. On final hearing. Bill dismissed.

Decree affirmed 254 U. S. ——, 41 Sup. Ct. 293, 65 L. Ed. ——.

Final hearing upon a bill in equity filed by the plaintiff, suing in his own behalf as a shareholder of Stöhr & Sons, Incorporated, and in behalf of all others similarly situated, against the Alien Property Custodian, the corporation and directors of Stöhr & Sons, Incorporated, and the corporation and directors of Botany Worsted Mills. Answers were filed by all the defendants and the cause came on for hearing before the District Court. Testimony was taken and arguments heard, and the case submitted for final decree.

The bill alleges: That the plaintiff is a shareholder of a New York corporation, Stöhr & Sons, Incorporated, and a naturalized citizen of the United States, residing in the county of New York. That on the 17th of February, 1917, and from then continuously until the present time, he was the owner of 44 shares of capital stock of Stöhr & Sons, Incorporated, which on the 20th day of February, 1917, became the owner of 14,900 shares of the capital stock of the defendant. Botany Worsted Mills, a New Jersey corporation. That on February 19, 1917, Stöhr & Sons, Incorporated, became and has since been the owner of 5,690 other shares of the Botany Worsted Mills (property which has now been eliminated from the suit). That all these shares were seized by the Alien Property Custodian on the 20th day of March, 1918, as enemy owned, and that pursuant to said seizure the Custodian caused to be elected the individual defendants as directors of the two corporations mentioned, and ordered the directors of the Botany Worsted Mill to issue to him as Alien Property Custodian all the shares of stock so seized. That he has assumed control and possession of the properties of such corporation and that the defendant directors have refused to recognize the rights of those who were former officers of said corporation, when the Custodian took charge. That the Custodian has in the daily newspapers of New York advertised these shares of stock for sale, although it was not necessary and never has been necessary to sell them, as both corporations are solvent and have large assets. That such sale would be in violation of the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½a–3115½j) and the Constitution of the United States as without due process of law and without any notice or opportunity given to Stöhr & Sons, Incorporated, to be heard in any judicial proceedings looking to the condemnation or sale of such shares. In especial that the Custodian has announced that he will exclude at such bidding any person who is not a citizen of the United States under section 12 of the act, which is unconstitutional. That he will allow no inspection of the plant, except to those who have deposited a certified check of $25,000, that the terms and conditions of sale are unreasonable and onerous, and that the sale of so large a quantity of the stock will necessarily result in a low price, especially as the sale will be conducted so as to exclude a number of prospective bidders, and result in undue sacrifice of the property sold. That Stöhr & Sons, Incorporated, is a domestic corporation, and not an alien enemy, and that the sale would therefore be in excess of the powers of the Custodian. That on November 23, 1918, nine days before the bill was filed, the plaintiff, under section 9 of the Trading with the Enemy Act (section 3115½e), filed a notice of claim with the Alien Property Custodian, demanding that the sale should not be made, which was disregarded. That the present directors of Stöhr & Sons, Incorporated, and the Botany Worsted Mills are creatures of the Alien Property Custodian, elected to carry out his interests, and that it would be useless to make a demand upon them to institute this suit.

The bill prays that the cloud on the shares of stock resulting from the capture be removed, that the capture be declared illegal and unconstitutional, and that the Custodian be enjoined from selling the shares. A copy of the contract through which Stöhr & Sons, Incorporated, acquired the shares of stock, is annexed to the bill.

Upon the hearing the following facts in substance developed:

Before February 15, 1917, there existed in the city of New York a partnership under the firm name of Stöhr & Sons, doing business as woolen merchants. The partners were Eduard Stöhr, the father, and his three sons, Hans E., Georg, and Max W. Their interest in the partnership was as follows:

| | |
|---|---|
| Eduard | $420,000 |
| Hans E. | 80,000 |
| Georg | 50,000 |
| Max W. | 10,000 |

—amounting in percentages to approximately 75 per cent., 14 per cent., 9 per cent., and 2 per cent. Eduard and Georg were German subjects, living in Leipzig; Hans E. was a German subject, living in New York, who had formally declared his intention of becoming a citizen; Max W. was a native German, but had become naturalized in 1910, and lived in New York. On February 15th Max W. Stöhr, George Röhlig, and Alfred de Liagre (relatives of the Stöhrs), executed a certificate of incorporation, under the laws of New York, of Stöhr & Sons, Incorporated, with a share capital of $250,000, and on February 17th the necessary formalities of incorporation were completed. The directors named were Hans E. and Max W. Stöhr, Röhlig, and De Liagre, and they were also the officers. On February 19th the assets of the partnership, amounting to more than $1,000,000 in value, were transferred to the corporation in exchange for the shares of stock, all of which were issued to Max W. Stöhr, with the exception of 357 shares, issued to Hans E. At the same time these shares were transferred to Hans E. and Max W. Stöhr and Georg Röhlig as "voting trustees" for five years under the laws of New York, and "voting trust certificates" were issued in the same proportion as the original issue of shares; that is to say, Max W. held all the "certificates," except 357 shares, which went to Hans. However, of those which Max received, he held 1,875 in trust for Eduard Stöhr, and 223 in trust for Georg Stöhr. Kammgarnspinnerei Stöhr & Co. Actiengesellschaft was a German corporation doing a woolen business in the city of Leipzig, Germany, and organized by Eduard Stöhr in 1880. It had a share capital of 12,000,000 marks, of which the ownership does not definitely appear. Hans owned something over 1,000,000, Georg between 1,500,000 and 2,000,000, Max 600,000, and Eduard more than any of them; but the total is not given. There were many other shareholders as the shares were listed on the Berlin Boerse and had been generally distributed to an extent not disclosed. On last information, Eduard Stöhr was president of the "aufsichtsraht," corresponding generally to the board of directors of an American corporation; Hans E. was a member of that body, and Georg was a managing "director"—i. e., one of the two "procuristen."

This corporation for long had held 14,900 shares in the Botany Worsted Mill, one of the largest and best equipped mills in the United States, doing a profitable business at Passaic, N. J., in the manufacture of yarns and woolens. In 1915 10,000 of these shares were transferred on the books of the company to Hans E. Stöhr and 4,900 shares to Max W. Stöhr, each as trustee for the Leipzig company, and so they remained until the 20th of February, 1917. On that day Hans E. Stöhr, in New York, assuming to act for the Leipzig corporation, made a contract with Stöhr & Sons, Incorporated, through Röhlig, its vice president, a copy of which follows:

"Agreement made at Passaic, in the state of New Jersey, on the 20th day of February, 1917, between Kammgarn-Spinnerei Stöhr & Co., Aktiengesellschaft of Plagwitz-Leipzig, Germany, hereinafter called the 'Leipzig Company,' party of the first part, and Stöhr & Sons, Incorporated, hereinafter called the 'New York Company,' party of the second part, witnesseth:

"Whereas, the Leipzig Company is beneficially interested in fourteen thousand nine hundred (14,900) shares of the capital stock of the Botany Worsted Mills, a New Jersey corporation, which said shares of stock are now standing in the name of Hans E. Stöhr and Max W. Stöhr, and are represented by the following certificates, each certificate being for five (5) shares of said stock: * * *—and

"Whereas, the Leipzig Company is desirous of selling and said New York Company is desirous of purchasing said interest on the terms and conditions hereinafter set forth:

"Now, therefore, in consideration of the premises and of five thousand ($5,000) dollars paid by the New York Company to the Leipzig Company on account of the purchase price, the receipt whereof is hereby acknowledged, and in further consideration of the mutual promises of the parties as herein set forth, it is hereby agreed as follows:

"First. The Leipzig Company hereby sells, assigns and transfers unto the New York Company all of its interest in said shares, and said shares of stock shall be forthwith transferred upon the books of the Botany Worsted Mills and placed in the name of the said New York Company.

"Second. The terms of the sale and the purchase price for said shares shall be determined as follows and paid in the following installments:

"(a) The purchase price shall be determined by and shall be equal to the book value of said shares as shown by the books of the Botany Worsted Mills. The price shall be payable in five (5) installments, the first installment being payable one year from date and the subsequent installments respectively in two, three, four and five years from date. From the last or fifth installment the sum of $5,000 paid on account as hereinbefore recited, with interest at 6 per cent. from date, shall be deducted.

"(b) The first annual installment shall be based upon and shall be equal to the book value of said shares, as shown by the books of the Botany Worsted Mills according to the last previous closing of its books on November 30, 1917; and the four subsequent annual installments shall be similarly based upon and shall be equal to the book value of the shares as shown by the last previous closing of the books of the Botany Worsted Mills on the 30th of November preceding the falling due of each of said annual installments.

"(c) In arriving at the amount of each installment for each of said years the net worth of the hard assets of the Botany Worsted Mills, after deducting the total liabilities, shall be taken as the basis for the computation of the value per share, and no allowance or increase shall be made on such installment for good will.

"(d) In addition to the book value of said shares there shall be taken into consideration and account the amount of the dividends received by the New York Company during the said five years from date in the following manner:

"During the first year the amount of the entire dividends received by the New York Company on the said shares shall be added to the purchase price and shall be paid with the first installment, during the second year four-fifths of the entire dividends received on said shares of stock by the New York Company, during the third year three-fifths of said dividends, during the fourth year two-fifths of said dividends and during the fifth year one-fifth of said dividends so received on said shares shall be added to the annual installments of the purchase price and shall become part of said purchase price and shall be payable with each of said installments at the end of each of said respective years.

"Third. That the certificates of stock for said fourteen thousand nine hundred shares sold and transferred as hereinbefore provided shall be placed in the possession of the Leipzig Company as collateral security for the amount of the purchase price; but as each annual installment with said additions provided for in paragraph second, subdivision (d), is paid, the New York Company shall have the right to require the redelivery of, and the Leipzig Company will contemporaneously with the payment of each installment redeliver to the New York Company, one-fifth of said shares, and thereupon the Leipzig Company shall continue to retain the remaining shares as collateral security for the balance of the purchase price still payable.

"Fourth. The New York Company shall have the right at any time to require the deposit of the entire shares of stock or any balance thereof remaining in the hands of the Leipzig Company, with a bank or trust company to be selected by the Leipzig Company, such deposit to be made with such bank

or trust company in escrow, to be held until the purchase price or the balance remaining unpaid shall have been fully paid or (in case of nonpayment of any installment) until the Leipzig Company shall be entitled to said stock under the provisions of paragraph fifth of this agreement.

"Fifth. In the event that any of the said annual installments with said additions provided for in paragraph second, subdivision (d) hereof, shall not be paid when due, then the Leipzig Company shall notify the New York Company in writing that it requires the payment of the installment then due, together with the said additions, and in the event that the New York Company shall not within sixty (60) days after said demand pay the said installment, with the additions, then the said shares of stock or any remaining balance of said stock shall be forthwith retransferred to the said Leipzig Company on the books of the Botany Worsted Mills and all rights on the part of the New York Company to said stock or any such balance shall cease, and the Leipzig Company shall retain the five thousand ($5,000) dollars, paid on account as hereinbefore recited, in full settlement of any claim against the New York Company, and thereupon neither of said companies shall have any further claim against the other arising under or by reason of this agreement; it being understood that the nonpayment of any subsequent installment shall not affect the portion or portions of the stock which may have been fully paid for by a previous installment or installments."

At that time Hans E. Stöhr was himself president of Stöhr & Sons, Incorporated, a director and shareholder as above set forth. On the same day, through the direction of Hans E. Stöhr, a transfer was recorded upon the books of the Botany Worsted Mills of all these shares from the name of Hans E. Stöhr and Max W. Stöhr, as trustees, to the name of Stöhr & Sons, Incorporated. The certificates themselves remained in Leipzig and have never been returned to this country, and in such case the by-laws of the Botany Worsted Mills provided that, in order to be transferred, notice must be sent from a local official in Leipzig that the transfer had there been made upon the certificates. No such notice was in fact received or has been received from that day to this. The transfer was therefore not in accordance with the by-laws of the Botany Worsted Mills. The Botany Worsted Mills had itself been founded by Eduard Stöhr in 1889. It had a capital stock of $3,600,000, divided into 3,600 shares, and at the time of the execution of the contract Eduard, Georg, Hans, and Max Stöhr were all directors, and Hans as treasurer, was very active in its management although one Thomas Prehn was its president.

On October 6, 1917, Congress passed the Trading with the Enemy Act, and vested in the President the power to capture all enemy property. Section 7a of that act (section 3115½d) required all corporations who had any enemy shareholders to file a list of them as of February 3, 1917, and in December, 1917, Hans E. Stöhr and his counsel, one Heyn, an American, in accordance with the duty so imposed, made a report on behalf of Stöhr & Sons, Incorporated, and the Botany Worsted Mills. Correspondence and several interviews ensued, and on February 9, 1918, Heyn wrote a letter to the Custodian purporting to set forth all the facts. As to the 14,900 shares, he said as follows: "These shares were in the name of H. E. Stöhr and M. W. Stöhr, as trustees for Stöhr & Co., the Leipzig corporation, the beneficial interest being in Stöhr & Co. Regarding the contract for the purchase of said 14,900 shares of Stöhr & Sons, Incorporated, from Stöhr & Sons, of Leipzig, it has been fully explained that the control of Botany might be imperiled by a state of war, because the voting right on stock of alien enemies, or in which alien enemies had a beneficial interest (as was the case with said 14,900 shares), was doubtful under the decisions of the courts, and if deprived of the voting right the control of Botany might be lost. This contract was made with reference to the control of Botany as between its stockholders, and had, of course, no reference to the status of such control so far as the Alien Property Custodian is concerned. Such status is not affected, whether such shares are in Stöhr & Co., the Leipzig corporation, or in Stöhr & Sons, the New York corporation. As we also stated verbally, there have been no resolutions or other corporate action by Stöhr & Co. with the Leipzig corporation in confirmation

of this transaction." Later in the same letter he said: "Considerably more than a majority of the stock (of Botany) is controlled by enemy alien interests within the meaning of the Alien Enemy Act. The total of the stock thus controlled (directly or indirectly) being 30,080 shares."

A copy of this letter at some time not definitely stated was approved in writing by Hans E. Stöhr. Before Heyn wrote it Hans E. Stöhr, who was himself not allowed to go to Washington, had written to Heyn two letters on February 5, 1918. In one he gave a list of the stockholders of the Botany Worsted Mills, and among the foreign stockholders he listed the Leipzig corporation for 14,900 shares; the other read as follows: "I herewith wish to state that the majority of the stock of the Botany Worsted Mills, Passaic, N. J., and of Stöhr & Sons, Incorporated. New York, is held by parties who are alien enemies under the Trading with the Enemy Act. (This information is given by me as treasurer of the Botany Worsted Mills and as president of Stöhr & Sons, Incorporated.)" A majority of the shares of the Botany Worsted Mills necessarily included the shares here in question.

On April 5, 1918, the Alien Property Custodian served a demand under section 7c of the Trading with the Enemy Act and sections 2a and 2b of the executive order of February 26, 1918, assuming to capture all the right, title and interest of the Leipzig company in the shares of stock of the Botany Worsted Mills. This was followed by a second demand later, and in February, 1919, he served another demand to capture all the interests of the Leipzig Company in the contract of February 20, 1917. By virtue of the transfer so effected, the Custodian obtained the registry in his own name upon the books of the Botany Worsted Mills of the shares of the Leipzig corporation and elected the individual defendants as directors of the company and of Stöhr & Sons, Incorporated. Both corporations have been under the control of such directors or their successors from that time until the present. In the autumn of 1918 the Custodian, as allowed by section 12 of the Trading with the Enemy Act as amended (section 3115½ff), advertised for December 2, 1918, the sale of a large number of shares of the Botany Worsted Mills. including the Leipzig Company's shares. Section 12 prevents any person not an American citizen from bidding at such a sale. He also in his advertisement annexed those conditions described in the bill. The bill was filed on December 2, 1918, and the sale was postponed. Heyn and Hans E. Stöhr have since died.

Upon the trial the plaintiff insisted that Hans E. Stöhr was authorized to execute the contract of February 20, 1917, in the name of the Leipzig Company, and prayed that the trial should be postponed until it were possible to obtain evidence of that fact in Germany. The court reserved decision upon that question until it could learn whether the issue was material to a disposition of the case, meanwhile requiring of the plaintiff to submit by affidavit the particulars of such proof as he could make if permitted.

Louis Marshall and Louis J. Vorhaus, both of New York City, for plaintiff.

George L. Ingraham, of New York City, and Lee C. Bradley and William H. Sadler, Jr., both of Birmingham, Ala., for Alien Property Custodian.

John Quinn and Paul Kiefer, both of New York City, for other defendants.

LEARNED HAND, District Judge (after stating the facts as above). [1, 2] This suit, in spite of its claim under sections 24 and 57 of the Judicial Code (Comp. St. §§ 991, 1039), must be regarded as dependent for jurisdiction upon section 9 of the Trading with the Enemy Act. The plaintiff filed a claim, avowedly made under that act, a few days before bill filed, which he made a part of the bill itself, and there is, therefore, no procedural condition lacking to his rights. The fact

that he has claimed jurisdiction erroneously need make no difference, if the evidence falls within that section, and especially if he has no other possible remedy. That he had none appears from a consideration of the purpose and structure of the act itself. Under section 7c the President may seize all property which he decides to have enemy character, and under section 7e all who comply with his demands get immunity in all courts. But nothing is settled by the capture itself except bare sequestration of the property in the hands of the Alien Property Custodian.

[3] It is quite true that under section 12 as amended his powers are extended to include the general power to sell, but under section 9 any claimant friend may file a bill such as this, and either the bill automatically stays the sale, or at least the court may stay it in a proper case, and such a suit section 9 makes the sole remedy of claimants. Thus it is apparent what the scheme of the act was. The reduction to possession of enemy property should be absolute, final and incontestable; it was to proceed by ex parte investigation and without right of review; it should include all property that the Alien Property Custodian decided to have enemy character. But it adjudicated nothing and its effect upon any right but that of possession was nil. In a suit under section 9 the investigation and decision are irrelevant. Instead of an original libel of information to condemn the property upon capture, which places the initiative upon the captor, the initiative in restoration is given to claimant friends, who, as soon as they choose within a fixed period, may reclaim under section 9; until they do the Alien Property Custodian is free to manage and even to sell under section 12 as amended. In the reclamation suit the validity of the capture is for the first time to be tested, and the question of title to be adjudicated. If the fixed period passes without any suit, the title by capture becomes good by a kind of prescription or limitation.

[4] Such being the plainly disclosed plan of the act, it is apparent that the plaintiff here has no standing, unless as it be under section 9, or unless the act be unconstitutional. The plaintiff does attack it as unconstitutional and this objection must first be considered. Cases like McVeigh v. U. S., 11 Wall. 259, 20 L. Ed. 80, and Windsor v. McVeigh, 93 U. S. 274, 23 L. Ed. 914, are not pertinent. They arose under the Civil War Confiscation Acts, which did not forfeit the property of all Confederates by virtue of their status, but of only six specified classes. There was no way for a claimant, even though an avowed Confederate, to prove that he was not within those classes except by appearance in the suit. To strike out his appearance in limine, on the ground that he was an enemy, as was done, was therefore to deny him the legal procedure accorded him by the statute. Section 9 is the precise equivalent of this right, at least so far as concerns claimant friends, who are alone concerned here.

The sole basis for the plaintiff's claim of unconstitutionality comes down, therefore, to the Custodian's power of initial sequestration ex parte. But how does this differ in substance from the customary right upon libels of information in rem to arrest whatever property officials may decide to be forfeit? Such property may not be reclaimed pen-

dente lite by filing a bond; the claimant must endure the temporary loss of possession until the innocence of the res is adjudicated. The public purpose of the statute so far overrides this incident of his rights of property. How much more is this the case in time of war where the interests are vital? The difference is one merely of procedure; the substantial rights are the same, for capture effects no more than an arrest in rem. The right to sell is the only addition, and I have shown that this is at least subject to judicial control in the event of a bill filed under section 9. The act, therefore, affords a complete remedy to all claimant friends, and is constitutional. As to claimant enemies. I have already considered its validity in Kahn v. Garvan (D. C.) 263 Fed. 909, but the point does not arise here.

The purpose of this suit is to prevent the sale of 14,900 shares of stock in the Botany Worsted Mills formerly owned by Kammgarnspinnerei Stöhr & Co., a German corporation doing business in Leipzig. All right of this corporation was captured under section 7c and sections 2a and 2b of the executive order of February 26, 1918, by the Alien Property Custodian's demand on April 5, 1918, and all its rights under the contract of February 20, 1917, mentioned below, were later captured in February, 1919. Nobody questions, as I understand it, that these demands effectively divested, whatever rights the Leipzig Company had against Stöhr & Sons, Incorporated, but the dispute is as to what these were. I shall assume for argument's sake that a shareholder may bring a representative suit in the right of his corporation under section 9, and that the plaintiff here has shown a situation justifying his recognition in that capacity. I shall further assume, though the fact is no way proved, that Hans E. Stöhr had a general authority which would cover the execution of contracts for the sale of such property as this for a consideration such as this. This assumption is all that the plaintiff has suggested he could prove, if he had the chance to take proof in Germany.

[5] The precise issue then becomes, what rights the Alien Property Custodian got by his symbolic act of capture, and whether they gave him a right to sell under section 12. This question has nothing directly to do with the statute; it concerns, first, the rights of the Leipzig company; second, whether the belligerent rights of the United States were greater than the rights of the Leipzig company inter partes. If, then Stöhr & Sons, Incorporated, has no interest in the shares which forbids the sale, the capture made the Custodian an unconditional cestui que trust by substitution under the transfer of 1915 to Hans and Max Stöhr. They, being dry trustees, cannot complain of the transfer of legal title to the Custodian's name, and section 12 authorizes the sale. The question in the end turns upon the effect of the contract of February 20, 1917, which, viewed merely within its four corners, purported to convey to Stöhr & Sons, Incorporated, the shares, which were registered as such on the Botany Worsted Mills books in professed compliance with its terms. I shall assume that "title" to the shares thereby vested in Stöhr & Sons, Incorporated, in spite of irregularity under the by-laws of Botany Worsted Mills.

The contract, verbally taken, was one of two kinds—either a sale

with the purchase price payable in five future annual installments, the Leipzig Company meanwhile reserving a vendor's lien, or an option granted Stöhr & Sons, Incorporated, to buy one-fifth of the shares in five successive years, provided they made each payment within sixty days after due date. If the contract is valid at all against the United States, and if it was intended as written, on either interpretation the plaintiff is entitled to some relief, because, under the first, the Leipzig Company must sell under its vendor's lien, and such a sale would be free from the limitations of sales under section 12 as amended. If, on the other hand, Stöhr & Sons, Incorporated, has only an option, then it can be terminated only on 60 days' notice, and no such notice has been given. Therefore, if the contract is valid against the right of capture, the Alien Property Custodian must prove that it was not the true intent of the parties, and that the equitable right of the Leipzig Company is unclogged by any equity of redemption or option. I shall first assume that it would be valid against the United States.

[6] In order to ascertain the real intent of the parties on February 20, 1917, it is necessary first to consider their situation and the events of the day before. The firm of Stöhr & Sons was composed of three Germans and one naturalized American, whose interest amounted to less than 2 per cent. It was for all practical purposes, therefore, a German firm doing business in New York, and it was obvious, after February 3, 1917, the day when Count von Bernstorff received his exequatur, that its existence was imperiled by the almost certain event of war. On February 15, 1917, Max, the American partner, and De Liagre and Röhlig, also naturalized Americans, executed a certificate to form a New York corporation of 2,500 shares. In the certificate of incorporation Hans Stöhr was made a director, and he became president at once. All the stock was by several transfers issued to Hans E. and Max W. Stöhr and to Röhlig in exchange for the firm property, having a net value of over $1,000,000, and they held it when issued as "voting trustees" under the New York statute for five years. "Trust certificates" were issued by these trustees to the four Stöhrs in proportion to their interests in the old firm, except that Max, the American, held the certificates of Eduard and Georg residing in Germany, in trust for them, a trust upon a trust.

The result was that on February 19, 1917, the share of the German partners had not been put beyond the reach of capture any better than if the firm had remained in existence. All that was accomplished, and in my opinion all that was desired, was to secure the firm against dissolution in the event of war, and to insure the voting right in two Americans on whom Hans could rely, if his own right to vote on the shares became affected by his enemy character. I doubt whether the parties then or later thought of any possible confiscation at all; but, if they did, it is clear either that they despaired of any successful evasion of it, or that they were constrained by motives of prudence or conscience. In any event they left the substantial interests of the partners susceptible to capture and confiscation.

On the following day Hans E. Stöhr, assuming to act for the Leipzig Company, made the contract here in question with Stöhr & Sons,

Incorporated. The plaintiff argues that it effected an immediate change of title to the shares here in suit and that it left in the Leipzig Company no interest save a vendor's lien. The execution of that contract could have been actuated as little by a desire to escape capture by the United States as were the transactions on February 19, 1917, and for the same reason. From the point of view of the Leipzig Company nothing was gained. The first payment was a year in the future, and the rest succeeded annually. If the United States were to confiscate enemy property, the consideration was as easily discovered as the shares; it would equally be lost. From the point of view of Stöhr & Sons, Incorporated, nothing was gained, because while the shares became the property of a New York corporation, all but 2 per cent. of its shares, controlling the substantial interest in the assets, was equally lost. Hence the contract was not tabula in naufragio; some other motive must be found.

On the other hand, it is clear, of course, that the contract was not a commercial transaction. The occasion is enough to prove this and the events leading up to it. Besides, the contract itself proves that it could not have been due to ordinary commercial motives. The Botany Worsted Mills had been a successful business, already 28 years in existence and one of the largest and best equipped in the United States. No possible reason can be suggested for the sudden sale of nearly a majority of its shares, which was not based upon an emergency. Moreover, the consideration was inadequate. It expressly omitted the good will, which must have had a substantial value, and it fixed no present price at all, so that it insured nothing to the Leipzig Company except a sale of one-fifth each year at the then book value of its "hard assets." If the shares fell in value the Leipzig Company bore the loss, both in general value and in book value; if they rose, it did not share the gain, except in so far as that was reflected in book values. Possibly it is legitimate to observe, also, that our entrance into the war was likely to have that advantage to woolen mills which the event proved.

Now, Hans E. Stöhr was not acting alone for himself and his family. The record does not show how many outside shareholders there were in the Leipzig Company, but they were many. He was in the position of selling for an apparently inadequate consideration, to his family, property in which other persons were interested as well as they. The contract, if not, therefore, justified upon the principle of selling to Crassus a burning house, could not be justified at all; it was apparently a fraud. And even if not clearly such, it was voidable at the instance of any single German shareholder who chose to protest. It was not likely that Heyn, a capable adviser, should have seriously expected a contract with such infirmities to stand; indeed, it is not credible that the parties could have intended it as a commercial bargain at all, except it were, what is was not, a desperate catch at salvage.

Besides, to give even a colorable plausibility to the bargain, the plaintiff's position requires the assumption that the contract was mutual in its obligations. The point is not in any sense critical, but perhaps worth notice, because it was pretty clearly not a contract of purchase, but only an option. Of course, I am aware of the doctrine that bilateral

obligations are generally presumed in like cases, and that the courts will light on such words as "agreed" and the like, when they need them, but all such canons are only guides to the interpretation of general intent. I should perhaps think that the obligations were mutual, were it not for article 5; but, that being there, the omission of any express promise to pay may well have been deliberate. Article 5 in terms provides that the remedy of the Leipzig Company on default shall be one which is in substance strict foreclosure, and that after strict foreclosure there shall be no further right of action on either side. It is quite true that it does not expressly say that this shall be the only remedy; but in view of the conclusion of the article I should be disposed so to construe it, especially when, as I have said, there are elsewhere no express covenants to pay the purchase price. It is unexpected, to say the least, that an experienced lawyer like Heyn should have introduced a clause of strict foreclosure in a genuine contract of sale, knowing it to create a forfeiture. The structure of the contract, therefore, if the case turned on it, would lead me to call it an option.

The surroundings confirm that conclusion. As I have shown, while the contract was heavily weighed against the Leipzig Company, conceivably it might involve Stöhr & Sons, Incorporated, in embarrassing obligations, because the transaction was large. After the annual appraisals, the shares might fall; the company might be on an obvious decline. Some recalcitrant Leipzig shareholder might insist upon ratification of the bargain and place Stöhr & Sons, Incorporated, in an awkward predicament. But, if it were only an option, all this would be avoided. The omission to include any promise to pay at least fits with that purpose not to induce the Leipzig Company to call for performance, which may be inferred from the unequal inducements of the contract to either party. If the contract were never intended to be enforced, and if some of the Leipzig shareholders were not altogether reliable, we should look for a contract in substance and in form not dissimilar.

But as an option for $5,000 to purchase during a period of five years $5,000,000 of shares at prices which confessedly omitted an important element of value, the contract is too open a fraud upon the Leipzig Company to admit even of argument. Hans E. Stöhr and Heyn were not engaged in any such enterprise; the plaintiff would be the last to suggest that they were. Therefore I think I may say that it is demonstrated that neither was the contract intended to sell out in an emergency so as to escape putative capture, nor was it a genuine business transaction dependent upon an estimate of the mutual advantages of the parties. There remains only the possibility that it was not intended to represent the real purpose of the parties at all, but to serve as a cover for another purpose.

We are, moreover, not left to surmise as to what that purpose was, because the written statements of Hans E. Stöhr and Heyn just before the capture very frankly disclose it. It was merely the continuation of what they had done in 1915, when they put the legal title in the name of Hans E. and Max W. Stöhr for convenience of management, and what they had done in the case of the partnership just before February

20, 1917, for the same reason. They wished to put their house in order against the disabilities and inaccessibility of their German associates during the period of a war which could certainly not go more than five years. This they did, so far as I can see, without the slightest anticipation of any confiscation of enemy property, which had, indeed, been generally supposed for over a century to be obsolete.[1]

Hans E. Stöhr wrote two letters to Heyn on February 5, 1918, while Heyn was in Washington, arranging, so far as he could, the affairs of the Stöhrs with the Alien Property Custodian. In one letter he said that the shares in question were owned by the Leipzig Company; in the other that the majority of the Botany Worsted Mills was enemy owned. Each was probably intended for transmission to the authorities, and each flatly contradicted the contract of February 20, 1917, at least unless it was an option, which, as I have shown, is incredible. When Heyn came to make his final statement, cumulative upon the earlier reports under section 7a—a statement which Hans expressly approved—he specifically mentioned the contract of February 20, 1917, and referred it exclusively to the supposed danger to the voting control of the Botany Worsted Mills. It "had," said he, "of course, no reference to the status of such control so far as the Alien Property Custodian is concerned. * * * Considerably more than a majority of its stock is controlled by alien enemy interests within the meaning of the Alien Enemy Act."

This information was given in compliance with section 7a, the second paragraph of which requires a statement as of February 3, 1917, of all enemy shareholders who the corporate officer had cause to suppose then or later owned any shares. Heyn would have had to disclose that Hans E. and Max W. Stöhr were trustees on February 3, 1917, for so the books would show. The section in addition required him to say what shares were enemy owned though standing in the name of another when the report was filed. He was therefore positively required to state the character of the relations arising under the contract of February 20, 1917, and his account of it was authoritative. There can be no question that, had the Leipzig Company had only a vendor's lien, it would have been a wrong upon Stöhr & Sons, Incorporated, to fail to state its full rights. In saying that the "control" for purposes of the act was in the Leipzig Company, I may fairly suppose that he had in mind those provisions of section 7a under which he was acting; he used "control" as "owned."

Heyn and Hans S. Stöhr are now dead, but the aspect which the plaintiff seeks to put upon the contract is an apocryphal afterthought, which there is no reason whatever to suppose that they, were they alive, would now have the disposition, or the hardihood, to adopt. Their

---

[1] Oppenheim, International Law, vol. 2, § 102; Halleck, International Law, c. 19, §§ 12–21; Wheaton, International Law (5th Eng. Ed., 1916) pp. 417, 416, 419, 424, 425, 426; Hall, International Law (6th Ed. 1909) pp. 431–435; Twiss, The Law of Nations, §§ 53–56; Westlake, International Law, vol. 2 (1907) pp. 36–44; Hague Second Conference, art. 53, "Regulations Respecting the Laws and Customs of War on Land." Magna Charta, § 41, seems to have contained the germ of the same idea.

declarations ante litem motam fit that interpretation, which alone acquits them at once of any purpose to defraud either their associates or the United States in its right as captor. I have no question that the beneficial ownership of the Leipzig shares was always intended to remain in the Leipzig Company.

[7] The question whether the contract was invalid as a fraud on the belligerent rights of the United States is not, therefore, of critical consequence, in view of the completeness of the proof that there never was any transfer at all. The nearest authorities I have been able to find are those relating to prize. It was well settled before the Great War that under French law no transfers of cargo or bottoms, flagrante bello, were valid; this being recognized as in diminution of the belligerent's right of capture, though under American and British law the same doctrine did not obtain.[2] In those countries such transfers are valid, but only if made while the goods or vessel are not in transitu. The Benito Estenger, 176 U. S. 568, 20 Sup. Ct. 489, 44 L. Ed. 592; The Bawean [1917] Prob. Div. 58; The United States [1916] Prob. Div. 30.

[8] The claimant must, moreover, even when the goods were not in transitu, establish an unconditional transfer, and the scrutiny as to this point is especially severe; any retention of enemy interest being sufficient to prevent its being regarded as absolute. The Benito Estenger, supra; The Sechs Geschwistern, 4 Ch. Rob. 100; The Jemmy, 4 Ch. Rob. 31. If the sale were absolute of a vessel or cargo not in transitu, being good flagrante bello, it was a fortiori good, imminente bello. But if the sale be imminente bello, and in contemplation of war and to avoid capture, the same limitations applied. The Daksa [1917] App. Cas. 386; The Southfield [1917] App. Cas. 390, note (Sir S. E. Evans); The Tommi [1914] Prob. Div. 251; The Jan Frederick, 5 Ch. Rob. 115; The Vrow Margaretha, 1 Ch. Rob. 337; The Baltica, 11 Moore, P. C. 141. Thus, an absolute sale of goods in transitu, or a sale with reservation, is void, if made to avoid capture. In general, it is the rule that the enemy character of the goods depends upon their character at the outset of the voyage. The Packet de Bilboa, 2 Ch. Rob. 133; The Ann Green, Fed. Cas. No. 414.

It is quite true that the right of capture on land depends upon the action of Congress (Brown v. U. S., 8 Cranch, 110, 3 L. Ed. 504), and is not a part of our customary law arising from a state of war. Yet the incidents of sea capture might, in the absence of contrary legislative expression, be perhaps looked to as a fair analogy. The reason of the rule which makes the transitu a test of the validity of a transfer, imminente bello, was considered by the Privy Council in The Baltica, supra, and it was held to be the difficulty involved in detecting reserved enemy interests. Therefore a ship was restored when delivery was made to the transferee at an intermediate port. The theory was

---

[2] Oppenheim, International Law, War, §§ 91, 92; Westlake, International Law, part 2 (Ed. 1907) p. 150; Hall, International Law, part. 3, c. VI (6th Ed.) 499, 500; Wheaton, International Law (5th Eng. Ed.) 576, 577; Twiss, Law of Nations, part 2, §§ 162, 163. The Declaration of London, §§ 56, 57, made certain modifications in the British and American rule.

repudiated that while at sea the belligerent's rights are already inchoate, and that the ship has come, as it were, already into the jurisdiction of the captor.

[9] In spite of The Baltica, supra, it might still be that sales of goods within enemy territory, imminente bello, and to avoid capture, ought to be regarded as in fraud of belligerent rights, if the statute said nothing. A serious argument might be made in favor of such a result, once a policy of land capture be inaugurated; but under this act it appears to me that section 7b effectively closes any such discussion. A part of the first paragraph of that section reads as follows:

"No person shall by virtue of any assignment * * * to him of any * * * chose in action by * * * an enemy * * * have any right or remedy against the * * * obligor * * * unless said assignment * * * was made prior to the beginning of the war."

It might indeed be open to a good deal of question whether this included an assignment of equitable interests in shares of stock (Brown v. Fletcher, 235 U. S. 589, 35 Sup. Ct. 154, 59 L. Ed. 374), though shares are analogous to choses in action (Jellenik v. Huron Copper Co., 177 U. S. 1, 20 Sup. Ct. 559, 44 L. Ed. 647), and a fortiori equitable interests in shares. But I think that the purpose of the statute is pretty clearly indicated, even if its letter do not cover this precise case. It can scarcely be supposed that an exception would be made in favor of ante bellum transfers of choses in action which did not apply to property so nearly akin as this, or indeed to all property, and it is clear that absolute transfers of choses in action before April 6, 1917, would be valid. Apparently the United States meant not to inquire into such transfers as in fraud of its rights. There is no reason to extend the application of so penal a statute beyond its fair import; therefore the capture must stand upon the ground that the contract conveyed nothing to Stöhr & Sons, Incorporated. Upon that ground it finds sufficient support.

It becomes unnecessary to consider the prayer of the plaintiff for letters rogatory.

Upon the understanding that this suit now concerns only the 14,900 shares of the Leipzig Company, the bill will be dismissed, with costs.