Hermann F. and Madeleine duPont RUOFF, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 12907.

United States Court of Appeals Third Circuit.

Argued Dec. 8, 1959.

Decided April 6, 1960.

Karl Riemer, Washington, D. C. (Lawrence S. Lesser, Pehle, Lesser, Mann, Riemer & Luxford, Washington, D. C., Anna H. Isenschmid, William J. Topken, Topken & Farley, New York City, on the brief), for petitioners.

Sharon L. King, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, A. F. Prescott, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before KALODNER, STALEY and HASTIE, Circuit Judges.

KALODNER, Circuit Judge.

Are attorney fees incurred in contesting the Attorney General's seizure of the taxpayer's[1] income-producing property under the Trading with the Enemy Act, as amended,[2] deductible from gross income under the provisions of Section 23 of the Internal Revenue Code of 1939, as amended?[3]

The question, of first impression, is presented by this petition for review of the Decision of the Tax Court of the United States which answered it in the negative, five judges dissenting.[4]

1. The relevant facts relate to the property and activities of Madeleine duPont Ruoff, referred to in this opinion as "taxpayer". Her husband, Hermann F. Ruoff is involved in this petition for review only because a joint return was filed.

2. 50 U.S.C.A.Appendix, § 1 et seq.

3. 26 U.S.C.1952 ed., § 23.

4. 1958, 30 T.C. 204.

The facts were stipulated and so found by the Tax Court as follows:

Madeleine duPont Ruoff, ("taxpayer"), and Hermann F. Ruoff, her husband, are citizens of the United States residing in Mahwah, New Jersey. They filed their joint federal income tax return for 1953 with the Collector of Internal Revenue for the district of Delaware. They kept their books and made their 1953 tax return on the cash basis.

On September 23, 1948, the Attorney General of the United States issued a vesting order under the Trading with the Enemy Act, relating to taxpayer's property. By that order he (a) found taxpayer to be a citizen of an enemy country, Germany; (b) determined that the national interest of the United States required that she be treated as a German national; and (c) vested in himself all of taxpayer's property in the United States, as identified on a schedule annexed to the order. He amended the vesting order *nunc pro tunc* on October 1, 1948. The Attorney General maintained powers of supervision and control with respect to all of taxpayer's property in the United States, but an order dated December 8, 1948, terminated supervision and control of certain property not here in controversy.

On September 23, 1948, taxpayer owned various corporate stocks and corporate and municipal bonds of an aggregate value of approximately $2,000,000. Before, at, and after September 23, 1948, those stocks and bonds produced annual dividend and interest income aggregating about $75,000. The property vested in the Attorney General included these stocks and bonds.

On September 23, 1948, taxpayer was the life beneficiary of the income of a trust established by herself in 1927 for her own benefit and that of her sons as remaindermen. The value of the corpus of the trust approximated $250,000 with an annual income of approximately $10,-000. The property vested in the Attorney General included taxpayer's interest in this trust. It also included an interest in a mortgage requiring periodic principal and interest payments amounting to about $240 per year.

On October 7, 1948 taxpayer retained attorneys to pursue whatever administrative and judicial remedies were available to secure the return of the vested property. On November 10, 1948, the attorneys filed with the Attorney General taxpayer's notice of claim under the Trading with the Enemy Act for the return to her of the vested property. On November 15, 1948 they filed a civil action under the Trading with the Enemy Act in the United States District Court for the District of Columbia on taxpayer's behalf against the Attorney General for the return to her of the vested property, alleging that taxpayer was at all material times the lawful owner of the vested property. The defendant, the Attorney General, denied the allegation.

On August 12, 1953, taxpayer's attorneys and the Attorney General entered into a stipulation settling these matters. The stipulation provided that the vested property should be returned to taxpayer but that the Attorney General should retain the income increment thereon from the date of vesting to the date of the stipulation. On November 23, 1953, the Attorney General returned the vested property to taxpayer in accordance with the stipulation. The property returned to taxpayer included state and municipal bonds in the face amount of $88,000. The settlement stipulation also provided for the sale of taxpayer's life interest in the trust to the Attorney General.

Representation of taxpayer in these matters required that her attorneys do extensive preparatory work, make numerous appearances and arguments in court, and attend many conferences with departmental officials. Taxpayer paid $67,800.72 to her attorneys in 1953, which was reasonable compensation for the services rendered.

Taxpayer and her husband deducted $67,800.72 from gross income on their 1953 income tax return as legal expense. The Commissioner of Internal Revenue disallowed this deduction but in recomputing taxpayer's gain realized from the

sale to the Attorney General of the life interest in the trust, the Commissioner allocated to the basis of the life interest $8,594.81 of the total legal fees of $67,-800.72. The Tax Court sustained the Commissioner and this petition for review followed.

The Tax Court premised its decision on its conclusion that "In essence, the litigation * * * had as its subject only the petitioner's [taxpayer's] title to and possession of the seized property", and, accordingly, " * * * the present situation is no different from those in which it has been repeatedly held that expenses incurred in defense of title must be capitalized and are not deductible as current items."

On this petition for review taxpayer and the Commissioner cross swords in a duel of semantics—taxpayer contending its attorney fees were incurred in "recovering" the seized income-producing property while the Commissioner urges the fees were incurred in "reacquiring title" to the property. That that is so is apparent from taxpayer's "Statement of the Question Involved" and the Commissioner's "Counter-Statement of the Question Presented."[5]

The Tax Court, it may be noted, made no finding with respect to the "recovering" or "reacquiring title" contentions which were there advanced as they are here, but said with respect to them (at page 207):

"Giving petitioner's [taxpayer's] claim its broadest scope, and assuming without deciding that the contest * * * was one to 'recover' petitioner's property and to safeguard and defend it rather than to acquire property whose ownership she had lost, it is clear that petitioner's right to the property was to some degree involved, and that her situation thus still falls within the rule ["defense-of-title" rule]."

The substance of taxpayer's contention is that the question of "title" to the seized property was "merely incidental" in her efforts to "recover" the property; that she had held "perfect title" to it for many years prior to its seizure and that had she not had such title the Attorney General could not have seized it; that the Attorney General's Vesting Order categorizing her as "a national of a designated enemy country (Germany)" and seizing the property only operated, under the Trading with the Enemy Act as a "provisional sequestration", subject to subsequent determination whether the property or its proceeds should be restored to her or be dealt with as enemy property; that the "defense-of-title" rule was not applicable in this situation, and, accordingly, she was entitled to deduction of her attorney's fees under Section 23 of the 1939 Code as expenditures made for the "conservation * * * of property held for the production of income."

The crux of the Commissioner's position is that "the legal effect of the vesting order * * * was to immediately divest the taxpayer of all right and interest in and to the property and to vest the title in the Custodian [Attorney General]", that, as earlier stated, the attorney fees were incurred "to re-acquire title to the property" and were therefore "a capital expenditure"; and, "in order to reacquire the title, it was necessary for the

---

**5.** Taxpayer's "Statement of the Question Involved" reads as follows:

"The sole question involved in this appeal is whether the petitioners may deduct from gross income for Federal income tax purposes reasonable compensation paid to attorneys for their services in *recovering* from the Attorney General of the United States income-producing property which had been vested by that official under the Trading with the Enemy Act."

The Commissioner's "Counter-Statement of the Question Presented" reads:

"Whether the taxpayers may deduct from gross income the legal fee incurred in *reacquiring title* to property which had been seized pursuant to the Trading With The Enemy Act as an expenditure made for the 'conservation, or maintenance of property held for the production of income' within Section 23(a) (2) of the Internal Revenue Code of 1939." (Emphasis supplied.)

taxpayer to allege and prove, inter alia, that she acquired the 'original' or pre-vesting title prior to the June 14, 1941, amendment of Executive Order [8389, 12 U.S.C.A. § 95a note] which 'froze' or prohibited all transfers of foreign-owned property located in this country and that she had held it at all times thereafter until seizure."

Since the controversy here involves the application of Section 23(a)(2) of the Internal Revenue Code of 1939 it seems appropriate to state its provisions before proceeding to a discussion of the proper categorization of the attorney fees here.

"§ 23. *Deductions from gross income.* In computing net income there shall be allowed as deductions:

"(a) *Expenses.*

\* \* \* \* \* \*

"(2) *Non-trade or non-business expenses.* In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income."

It must immediately be noted that taxpayer does not dispute that expenditures in "defense-of-title" are capital outlays to be added to the cost of the property. She disputes, however, the Tax Court's application of the "defense-of-title" rule to the facts in the case at bar.

■ Coming now to the issue presented, which, as earlier stated, is one of first impression: Its resolution requires consideration of the setting of this case and preliminary determination of the effect of a "vesting order" upon title to the property seized, before deciding the applicability of the provisions of Section 23 (a)(2) of the 1939 Code.

We first direct our attention to the legal effect of a "vesting order" immediately on its execution upon title to the property seized.

Judge Learned Hand had occasion to consider the question in Kahn v. Garvan, D.C.S.D.N.Y.1920, 263 F. 909, and again

in Stöhr v. Wallace, D.C.S.D.N.Y.1920, 269 F. 827, affirmed sub nom. Stoehr v. Wallace, 1921, 255 U.S. 239, 41 S.Ct. 293, 65 L.Ed. 604.

Both these cases dealt with situations arising under the Trading with the Enemy Act.

In Kahn v. Garvan, supra, 263 F. at page 913, Judge Hand described the Trading with the Enemy Act as

" \* \* \* a statute drawn for the purpose of capturing and *sequestering enemy property* \* \*." (Emphasis supplied.);

at page 914 he said:

" \* \* \* *As the capture* is in no sense a condemnation, but *merely a sequestration,* section 9 furnishes complete relief to all who come within its terms, except for the necessary interruption of their possession, and the possible loss arising from conversion of the property into cash by sale, an incident which does not arise in this case. *The interruption to possession, or to the right to immediate possession,* was a necessary incident in practice to such a system, which was itself short of the actual war powers of the nation." (Emphasis supplied.)

at page 916:

"The act intends the *immediate reduction to possession* of all property which the Custodian shall decide to be enemy property; all questions arising from his mistakes, or even from his oppressive or arbitrary action, are relegated to suits under section 9. *By the capture nothing is condemned, nothing confiscated, nothing concluded.* The citizen runs only the risk of temporary dispossession through the misprision of the officials; not always a light matter it is true, but a necessary incident of war. \* \* \*" (Emphasis supplied.)

and again at page 917:

"The purpose [of the Act] was to accomplish a swift, certain, and final *reduction to possession* of vast quan-

tities of property involved in incredible complication of ownership and interest. That purpose could be accomplished only at the sacrifice of much that custom had made sacred; with its propriety courts have nothing to do; they may only learn what it was, and consider whether the constitutional limitations were observed. * * *" (Emphasis supplied.)

In Stöhr v. Wallace, supra, Judge Hand said with respect to the effect of a "capture" of property under the Trading with the Enemy Act, 269 F. at page 834:

" * * * Under section 7c the President may seize all property which he decides to have enemy character, and under section 7e all who comply with his demands get immunity in all courts. But nothing is settled by the capture itself except, *bare sequestration* of the property in the hands of the Alien Property Custodian.

"It is quite true that under section 12 as amended his powers are extended to include the general power to sell, but under section 9 any claimant friend may file a bill such as this, and either the bill automatically stays the sale, or at least the court may stay it in a proper case, and such a suit section 9 makes the sole remedy of claimants. Thus it is apparent what the scheme of the act was. The reduction to possession of enemy property should be absolute, final and incontestable; it was to proceed by ex parte investigation and without right of review; it should include all property that the Alien Property Custodian decided to have enemy character. *But it adjudicated nothing and its effect upon any right but that of possession was nil.* In a suit under section 9 the investigation and decision are irrelevant. Instead of an original libel of information to condemn the property upon capture, which places the initiative upon the captor, the initiative in restoration is given to claimant friends, who, as soon as they choose within a fixed period, may reclaim under section 9; until they do the Alien Property Custodian is free to manage and even to sell under section 12 as amended. In the reclamation suit the validity of the capture is for the *first time* to be tested, and the *question of title to be adjudicated. If the fixed period passes without any suit, the title by capture becomes good by a kind of prescription or limitation."* (Emphasis supplied.)

The Supreme Court, in affirming in Stoehr v. Wallace, supra, exhaustively reviewed the provisions of the Trading with the Enemy Act and their application. In doing so, after describing property seized under the Act as "sequestered," it stated (255 U.S. at page 243, 41 S.Ct. at page 295):

"By section 12 * * * the Custodian is clothed with *'all the powers of a common-law trustee'* in respect of all enemy property coming into his hands and is given authority, subject to the President's supervision, to manage and dispose of the same, by sale or otherwise, as if he were the absolute owner, *save as the power of disposal may be suspended by a suit under section 9."*

At page 245 of 255 U.S., at page 296 of 41 S.Ct., the Court said:

"That Congress in time of war may authorize and provide for the seizure and *sequestration* through executive channels of property believed to be enemy-owned, if adequate provision is made for a return in case of mistake, is not debatable. * * *"

With respect to the "adequate provision" for "return in case of mistake" the Court said (255 U.S. at page 246, 41 S.Ct. at page 296):

" * * * pending the suit [for return of the seized property] which the claimant may bring as promptly after the seizure as he chooses, the property is to be retained by the

Custodian to abide the result and, if the claimant prevails, is to be forthwith returned to him. Thus there is provision for the return of property mistakenly *sequestered* * * *." (Emphasis supplied.)

The Commissioner urges that the Second Circuit in Balkan Nat. Ins. Co. v. Commissioner, 1939, 101 F.2d 75, where Judge Hand was a member of the panel, expressly held (at page 77):

"Seizure of an alien's property under the Trading with the Enemy Act divested the alien owner of every right in respect of property or money so seized, and *passed title thereto to the United States* for such disposition as the Congress might thereafter see fit to make. Cummings v. Deutsche Bank, 300 U.S. 115, 120, 57 S.Ct. 359, 81 L.Ed. 545." (Emphasis supplied.)

With respect to this holding we can only say that we disagree because of the mistaken reliance by the Court on Cummings v. Deutsche Bank, supra, as authority for it.

It is true that in Cummings v. Deutsche Bank the Supreme Court said (300 U.S. at page 120, 57 S.Ct. at page 362):

"Alien enemy owners were divested of every right in respect of the money and property seized and held by the Custodian * * *. The title acquired by the United States was absolute * * *."

However, regard must be given to the fact that, in this case, as Judge Forrester pointed out in his dissent in the Tax Court, the claimant brought a suit in equity in *1934* as to property which had been "vested" during World War I. The suit was brought not under Section 9 of the Trading with the Enemy Act, 50 U.S. C.A.Appendix, § 9, but under Section 11 of the Settlement of War Claims Act of 1928, 50 U.S.C.A.Appendix, § 9, the scheme of which was a grant to former enemy aliens of the privilege of becoming entitled, upon conditions specified, to have their property returned to them.

As Judge Forrester stated (30 T.C. at page 216):

"It is now clear that the rule of this case and the language quoted above respect an *admitted* alien enemy against whom the original vesting order had 'become complete' either by prescription or by final judgment."

It would serve no useful purpose to discuss other cases cited to us by the Commissioner since they are clearly inapposite to the issue as to whether a "vesting order" immediately passes title to the seized property. We need refer only to Judge Forrester's exhaustive analysis of the cases cited by the Commissioner and his conclusions with respect to them with which we are in complete accord.

Upon consideration of the scheme of the Trading with the Enemy Act and its provisions, and the cases cited, we are of the opinion that a "vesting order" does not ipso facto confer title to the seized property in the Government.

We fully subscribe to Judge Forrester's statement (at page 218):

"* * * the conclusion is inescapable that title, as such, passes for the first time at the final conclusion in favor of the Government of claimant's remedial actions under the Trading with the Enemy Act or when the prescriptive time under such Act has run."

█ What has been said brings us to consideration of the applicability of the provisions of Section 23(a)(2) of the 1939 Code to the attorney fees paid by taxpayer in contesting the seizure of her property under the Attorney General's "vesting order."

Before proceeding to do so these facts should be added to the statement of facts, earlier made, in order to bring into focus the "setting" of this case:

Taxpayer remained in Germany during World War II even though as an American citizen she was entitled to apply for repatriation; however, her husband and children were at that time German citizens and could not have left Germany be-

cause of the war. At the termination of hostilities taxpayer applied for and received an American passport and returned to the United States on August 6, 1946. Except for a seven-week visit abroad in 1947, taxpayer has made her residence in the United States since her return to it in 1946. She was a resident and registered voter in Monroe County, Pennsylvania, when the Attorney General issued his "vesting order" September 23, 1948 and amended it on October 1, 1948.

Taxpayer's employment of counsel to pursue available administrative and judicial remedies on October 7, 1948 and their subsequent actions have already been stated. Her ownership of the property seized was stipulated, as earlier stated.

The facts stated make it "clear", as Judge Forrester stated in his dissent, that taxpayer's retention of counsel "was to recover her property which had been 'vested' ", and as Judge Fisher put it, in pursuance of "her statutory right to prevent (if she could prove her case) the ultimate confiscation of her property. * * * "

■ The question as to deductibility of the attorney fees incurred by taxpayer under Section 23(a)(2) is one of law.[6]

■ In its consideration we are guided by these well-settled principles: "Taxation is an intensely practical matter, and, it deals with realities not semblances; with substance and not form * * *."[7]; and "It must ever be kept in mind 'that the substance of the transaction will prevail over form.' "[8]

In connection with the foregoing, it should be noted that in his separate dissent in the Tax Court,[9] Judge Fisher stated (30 T.C. at page 210):

"I think the problem is one of *practical application of the tax laws* in an unusual setting. * * * " (Emphasis supplied.)

and Judge Forrester, in his separate dissent,[10] stated (at page 212):

"I must respectfully disagree with the majority opinion which I feel has used the easy and here false touchstone of 'defense of title' to arrive at a result *which ignores realities.*" (Emphasis supplied.)

The facts in this case make it evident that taxpayer retained counsel to pursue the remedies available under the Trading with the Enemy Act so as to "undo" the vesting of her income-producing property, and the services rendered by counsel were in "conservation" of that property.

That is the "reality" and "substance" of the situation under which the attorney fees were incurred.

Section 23(a)(2) provides for allowance, as deductions from gross income, of "ordinary and necessary expenses paid or incurred * * * for * * * conservation * * * of property held for the production of income."

Here it is conceded that the property seized by the Attorney General was income-producing. It is also unchallenged that the attorney fees were "reasonable". The record discloses that the services rendered by counsel resulted in the return by the Attorney General to taxpayer of the seized property. The return of the property to taxpayer was a "conservation" within the meaning of Section 23(a)(2).

The ultimate testing of rights to "title" in pursuance of the remedies afforded by Section 9—the recovery section—of the Trading with the Enemy Act was "merely incidental" to the pri-

---

6. Trust of Bingham v. Commissioner, 1945, 325 U.S. 365, 370, 65 S.Ct. 1232, 89 L. Ed. 1670.

7. Thompson v. Commissioner, 3 Cir., 1953, 205 F.2d 73, 78.

8. Urquhart v. Commissioner, 3 Cir., 1954, 215 F.2d 17, 19. See also Teleservice Co. of Wyoming Valley v. Commission-

er, 3 Cir., 1958, 254 F.2d 105, 110, certiorari denied 357 U.S. 919, 78 S.Ct. 1360, 2 L.Ed.2d 1364.

9. Judges Pierce, Forrester and Train agreed with Judge Fisher's dissent.

10. Judges Fisher, Pierce and Train agreed with Judge Forrester's dissent.

mary object of taxpayer's retention of counsel to "conserve" her income-producing property by effecting its return to her.

As was pointed out by Judge Fisher, in his dissent, taxpayer, in prosecuting her claim for the return of her property, " * * * was not in any realistic sense defending title under circumstances usually present in the 'defense of title' type of case."

This statement by Judge Fisher pinpoints the situation which existed here (30 T.C. at pages 210–211):

> "In the instant case, *no issue is raised as to whether title was in claimant at the time of seizure. The rights of the claimant revolved around the question of whether or not she was an enemy national under the Act* * * * It seems to me that the claimant was merely pursuing her statutory right to prevent (if she could prove her case) the *ultimate* confiscation of her property, and that her action in so doing was one of conservation of her basic interest in the property within the meaning of section 23(a)(2). * * *" (Emphasis supplied.)

The following cases are pertinent with respect to the deductibility of the attorney fees in the case at bar.

In Allen v. Selig, 5 Cir., 1952, 200 F.2d 487, 488, taxpayer, a widow, sued to establish her joint ownership of property held in the name of her deceased husband. It was there held that her counsel fees were deductible since they were not expended for the purpose of acquiring or defending title and her suit was "essentially conservatory in its nature one to conserve income producing property which she already owned, and to free her management from unwarranted fetters." In that case, as here, it was contended that the "defense-of-title" rule was applicable.

In Hochschild v. Commissioner, 2 Cir., 1947, 161 F.2d 817, a stockholder brought a derivative action against an officer and director to impose a trust on his stock for breach of his fiduciary duty. It was held that the defendant's counsel fees were "ordinary and necessary" expenses and as such deductible under Section 23. In doing so the Court rejected the Commissioner's contention that the counsel fees were incurred in a "defense-of-title", stating (at page 819):

> "We cannot agree that these fees which the petitioner paid in defense of the lawsuit were any the less deductible because his liability, if proved, might have destroyed his equitable title to the stock he held. His right to keep it was certainly in issue and in that sense his title to it was defended, to be sure, but the title as such was not perfected in any way by his expenditures for legal assistance. He thereby but fended off an abortive attack upon the conduct of his business as a fiduciary and by freeing himself from liability to his corporation to account for such conduct put all of his property beyond the reach of his then accusers."

In Rassenfoss v. Commissioner, 7 Cir., 1946, 158 F.2d 764 it was held that attorney fees paid in contesting the claim of an employee to a partnership interest were allowed as proper deductions under Section 23.

In so holding the Court stated (at page 767):

> " * * * Laying aside the legal question as to whether petitioner had any title to the partnership assets, it is perfectly plain, so we think, that the main and primary purpose of the suit which the petitioner defended was for an accounting and any question of title was merely incidental thereto."

To the same effect Commissioner of Internal Revenue v. Speyer, 2 Cir., 1935, 77 F.2d 824 and L. B. Reakirt, 1934, 29 B.T.A. 1296, affirmed sub nom. Commissioner of Internal Revenue v. Reakirt, 6 Cir., 1936, 84 F.2d 996.

It would be flogging a dead horse to pursue further consideration of this aspect of the instant case.

For the reasons stated the Decision of the Tax Court will be reversed and the cause remanded to proceed in accordance with this Opinion.