79 F.Supp. 886 (1948)
LOMAS & NETTLETON CO.
v.
UNITED STATES (two cases).
LOMAS & NETTLETON CO.
v.
KRAEMER, Collector of Internal Revenue.
Civil Actions Nos. 1940-1942.
United States District Court D. Connecticut.
August 27, 1948.
*887 *888 Wiggin & Dana, of New Haven, Conn. (F. H. Wiggin and Catherine J. Tilson, both of New Haven, Conn., of counsel), for plaintiff.
Adrian W. Maher, U. S. Atty., of New Haven, Conn., and John W. Hussey, Atty., U. S. Dept. of Justice, of Washington, D. C., for defendants.

Findings of Fact.
1. Plaintiff is a corporation organized and existing under the laws of the State of Connecticut. Throughout the period material to this controversy, plaintiff's business has been that of making loans secured by mortgages to itself individually and also to itself as trustee upon notes in the form of participating certificates which it sold to the public; managing real estate; insurance; and placing individual mortgages with insurance companies, F. H. A. and banks, and then servicing the mortgages. In 1938 and thereafter it was the exclusive mortgage correspondent for Connecticut for the Metropolitan Life Insurance Company from which it received much business. In 1934, the face amount of the outstanding mortgages in which the plaintiff individually and as trustee, was named as mortgagee aggregated $25,000,000 and the ownership of these mortgages through the issue of participating certificates was spread amongst about 5,500 investors, most of whom lived in Connecticut. Its sole voting stock originally consisted of 100 shares of common stock: in 1938 and subsequently there was outstanding $58,000 of said stock which was entirely owned by Kenneth E. Nettleton, Sydney W. Gould and Donald E. Nettleton, who were its president, secretary and treasurer, respectively, and a majority of its directors. An issue of preferred stock was also outstanding the ownership of which was spread amongst 498 investors.
2. The defendant in Civil No. 1942 after the death of Thomas S. Smith, Collector, on June 15, 1943, has been successively the Acting Collector and the Collector of Internal Revenue for the District of Connecticut.
3. On March 13, 1941, plaintiff filed its income and excess profits tax return for the calendar year 1940. This return was on a cash basis and showed a total tax due of $21,075.39, which amount was paid in quarterly installments to Thomas S. Smith, then Collector of Internal Revenue for the District of Connecticut, on March 15, June 15, September 15, and December 15, 1941. On September 1, 1943, taxpayer paid an additional assessment of 1940 taxes in the amount of $127.23 to Frank W. Kraemer, then the Acting United States Collector of Internal Revenue for the District of Connecticut.
4. On March 13, 1942, plaintiff filed its income and excess profits tax return for the calendar year 1941. This return also was on a cash basis and disclosed a total tax due of $26,582.35, which amount was paid to said Thomas S. Smith, Collector, as follows: $7,019.60 on March 15, $6,520.92 on June 15, $7,036.40 on September 15, and $6,005.43 on December 15, 1942.
5. On March 11, 1943, plaintiff filed its income and excess profits tax return for the calendar year 1942. This return, too, was on a cash basis and for the calendar year 1942 disclosed a total tax due of $2,259.51, which amount was paid as follows: $1,129.76 to said Thomas A. Smith, Collector, on March 8, 1943, and $1,129.75 to said Frank W. Kraemer, as Acting Collector, on September 8, 1943.
6. On March 14, 1944, plaintiff filed its income and excess profits tax return for the calendar year 1943. This return also *889 was on a cash basis and disclosed a total tax due of $45,102.22. On June 10, 1944, taxpayer filed amended income and excess profits tax return for the calendar year 1943 showing a total tax due of $47,687.97, which amount was paid to the defendant Kraemer in quarterly installments during the calendar year 1944.
7. Consistent with a revenue agent's report, additional income and excess profits taxes and interest thereon were assessed againt plaintiff on March 1, 1946, for the calendar years 1941 and 1942, in the respective amounts of $6,471.45 and $50,747.39. The assessments were satisfied by a payment of $49,990.43 on December 6, 1945; another of $403.89 on April 2, 1946; and a credit of $6,824.52 of an allowed over-payment for 1943 on April 9, 1946. On August 16, 1947, a refund for 1942 was made to plaintiff in the amount of $398.02.
8. Plaintiff had deducted as ordinary and necessary expenses in carrying on its business the following amounts: In 1941, $5,000 for legal fees paid and $6,620 for accountants' fees paid: in 1942, $16,840.77 for legal fees and $90,100 for cost of settling adverse claims. The disallowance of these deductions constituted the principal basis of the additional taxes assessed for 1941 and 1942 as above stated. The disallowances were based on the ground that the payments all constituted capital expenses.
9. On March 7, 1944, plaintiff seasonably filed claims for refund for the calendar years 1940 and 1941 in the amounts of $21,202.62 and $26,582.35, respectively, each with interest. The claims were rejected April 4, 1946. On March 15, 1946, plaintiff seasonably filed claims for refund of income and excess profits taxes aggregating $10,984.87, with interest; this claim was rejected on November 5, 1947. And on the same day plaintiff seasonably filed a claim for refund for the calendar year 1942 in the amount of $55,261.25: this claim also was rejected November 5, 1947. These claims for refunds were based upon the contention that the said deductions constituted not capital expenses but expenses of carrying on plaintiff's business and had been erroneously disallowed.
10. Lenox Realty Company, hereinafter called "Lenox," throughout the period material to this controversy was a Connecticut corporation, incorporated in 1907 and engaged in the business of buying and selling properties and owning and making second mortgages many of which were on properties subject to first mortgages held by the plaintiff. Lenox' common stock, of which 100 shares was outstanding, had sole voting rights, and was entirely owned by Kenneth E. Nettleton, Sydney W. Gould, and Donald E. Nettleton, who constituted its sole directors, and who were its president, secretary and treasurer respectively, as they were of the plaintiff. A third Connecticut corporation, known as the Lomas & Nettleton Mortgage Company, engaged in the mortgage business, was similarly owned, officered and operated. The three corporations occupied the same office in a building owned by Lenox, and of the three only the plaintiff had any employees in addition to its officers.
11. In January, 1939, Lenox had outstanding $4,450 shares of preferred stock which had a par value of $100 and the usual preference as to assets on dissolution. Originally this stock had all been sold to the public at par. Its value, as reflected on Lenox' books, declined from 108 in 1932, to 101 in 1936, to 49 by the end of September, 1938, when its cumulative dividend of 6% was seven years in arrears. During the period prior to January, 1939, by occasional circular letters addressed to the Lenox preferred stockholders and through its agents the plaintiff offered to purchase Lenox preferred stock at $20 per share, said offers constituting the only market then existing for said stock. Prior to April 1, 1935, plaintiff purchased 22 of said shares and between 1935 and January, 1939, 2680 of said shares, paying in most cases $20 per share therefor, so that by January, 1939, plaintiff owned a fraction over 60% of the outstanding preferred stock of Lenox.
12. In December, 1938, when the Lenox balance sheet showed a capital impairment of $200,000, application was made to the Superior Court for New Haven County in proceedings for the voluntary dissolution of Lenox pursuant to the provisions of Sections *890 3470-3472, General Statutes Conn. 1930. The court took jurisdiction of the proceedings and appointed appraisers who officially appraised the assets as of December 31, 1938, at $154,738.70.
13. Early in the year 1939 and while the voluntary dissolution proceedings of Lenox were pending and in process, one Masterton and others, holders of a minority of the preferred stock of Lenox, instituted a suit in the Superior Court for the appointment of a receiver of the affairs and business of Lenox under the provisions of Section 3467 of the General Statutes, Revision of 1930. This suit was contested by Lenox but judgment was entered in favor of Masterton and his associates on June 2, 1939. Lenox appealed from said judgment to the Supreme Court of Errors, which by an opinion reported in 127 Conn. 25, 15 A.2d 11, under the name Masterton v. Lenox Realty Company, affirmed the judgment. In the findings of fact made by the Judge who heard this cause, damaging charges were made against the plaintiff herein and its officers and directors relating to their conduct of Lenox' business. Certain of these findings were to the effect that the plaintiff, through its control over Lenox, had profited greatly at the expense of Lenox, and that Lenox had sound basis for prosecuting claims against the plaintiff for damages.
14. The judgment of June 2, 1939, in the case of Masterton v. Lenox Realty Company, superseded the voluntary dissolution proceedings of Lenox and the task of liquidation and dissolution was confided to Matthew A. Reynolds who was appointed receiver and took possession of Lenox assets. John M. Hutchinson and Joseph P. Kennedy were appointed appraisers and as of June 2, 1939, appraised the assets of Lenox, exclusive of the value of any right of action against the plaintiff and its directors, at a total value of $130,427.99.
15. In January, 1940, a committee was organized which in a circular letter dated January 8, 1941, addressed to former preferred stockholders of Lenox stated that it represented claimants who formerly held substantially in excess of a majority of all the preferred stock of Lenox which had been purchased by the plaintiff. This letter referred to the decision of the Supreme Court of Errors of Connecticut affirming the judgment of the Superior Court appointing a receiver for Lenox, and made reference to a statement in the opinion which was derogatory to the directors of Lenox and of the plaintiff. The letter then went on to say, "Therefore your committee is now about to bring or cause to be brought the necessary suit or suits in an effort to establish by order of court the rights of the claimants or some of them against Lomas and Nettleton Company." The contents of this letter became known to the directors of The Loamas and Nettleton Company shortly after it was circulated.
16. Former holders of 1469 shares of Lenox preferred stock who had previously sold their shares to the plaintiff herein, entered into an agreement with the above-described committee dated January 10, 1940, by which agreement, in addition to many other things, it was set forth in substance that because of fraud alleged to have been practiced by the plaintiff upon the former holders of preferred shares of Lenox who should become parties to the agreement, former stockholders had claims against the plaintiff for damages and rescission. Under this agreement the former holders of stock assigned to the committee their claims for rescission but not their claims for damages. Shortly thereafter the former holders of 540 additional shares of Lenox preferred stock signed and delivered to the committee a form of letter in which they stated that although they declined to join as parties to any suits which might be brought under the above-mentioned agreement, they nevertheless authorized the committee to include their claims in any settlement which might be made without suit.
17. In March, 1940, plaintiff brought suit against the committee asking that it be restrained from prosecuting any claims against the plaintiff, asserting that plaintiff's business was very sensitive to attack and that irreparable injury to it would result unless the injunction were granted.
18. On April 8, 1940, the receiver by his counsel asked the Superior Court for *891 permission to bring suit for the benefit of the receivership estate against the plaintiff, and its three directors and the Lomas & Nettleton Mortgage Company. In his application he recited that the Judge who had presided over the Masterton case had found that Lenox had causes of action against various and sundry corporations and individuals which should be pursued for the benefit of Lenox, and stated that in his opinion the interest of Lenox required that an immediate suit be brought against the individuals and corporations named. The court made an order permitting suit to be brought. Plaintiff's directors knew of this application and order at the time.
19. By a writ made returnable to the Superior Court on the first Tuesday of October, 1940, the receiver brought suit against the plaintiff's three directors with directions to make attachments in the amount of $800,000 and claiming $750,000 damages. Later by a pleading entitled "Substituted Paragraphs of Complaint in Response to Motion for More Specific Statement" under date of April 7, 1941, the receiver-plaintiff claimed against said defendants that as to a multitude of transactions said defendants ought to account to the receiver for large sums of money representing profits to the plaintiff herein and losses to Lenox. By motion dated December 31, 1941, the receiver-plaintiff moved the court that the plaintiff herein be cited in as a co-defendant in that action, and such an order was passed by the court, and by due process the present plaintiff was cited in. By amendment to the complaint therein, the receiver-plaintiff alleged that plaintiff herein had directly or indirectly benefited to the loss and damage of Lenox and claimed an accounting and judgment for the amount found due upon such accounting. Nowhere in said amended complaint did the plaintiff-receiver on behalf of the Lenox estate claim title to any specific assets in possession of the plaintiff or any equitable lien thereon. The defendants in said action denied all allegations of wrongdoing.
20. One Harkness, a constituent of the Committee who in 1937 had sold three shares of the preferred stock of Lenox to the plaintiff at $20 per share, brought suit for a rescission of said sale in the Common Pleas Court for New Haven County returnable on the first Tuesday of May, 1941, against the plaintiff and its three directors in a complaint replete with attacks upon the business activities of the plaintiff in its dealings with Lenox. The plaintiff herein filed an answer denying all allegations of wrongdoing and a cross-complaint claiming among other things an order citing in the members of the committee as parties defendant, an injunction against said members and judgment that they were not lawful assignees of the claims of Harkness.
21. The substance of the allegations in all of the actions brought and claims against the defendant, as above set forth, was to the general effect that by means of domination of Lenox by plaintiff's directors and officers the plaintiff and its officers had made profits at the expense of Lenox, for which they ought to account. These allegations were never admitted by the plaintiff.
22. In the year 1941, the Securities and Exchange Commission by its accountants and attorneys conducted over a period of some weeks an investigation into the plaintiff's affairs and into its relationship with Lenox. Preparatory to and throughout this investigation plaintiff required and had the services of accountants and legal advisers. This investigation was conducted pursuant to an order of the Commission dated November 14, 1940, which stated that plaintiff was registered with the Commission as a broker and dealer in securities and that the Commission had been advised that evidence had been obtained tending to show that plaintiff in its business dealings with Lenox had violated certain provisions of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a et seq. Plaintiff's accountants spent a great deal of time on its books and records and those of Lenox in preparation for the hearing. Constantly during this period an officer of the plaintiff was in touch with counsel concerning these same investigations. Plaintiff's counsel spent at least two weeks at a hearing conducted by officers of the S. E. C. No action was taken by the Commission upon the conclusion of this investigation.
*892 23. After the judgment of the Superior Court in which a receiver was appointed for Lenox, an investigation of plaintiff's business dealings with Lenox including an examination of plaintiff's representatives was undertaken by the State's Attorney of New Haven County who jointly with the receiver employed accountants, Messrs. Hadfield, Rothwell, Soule and Coates, to examine the plaintiff's books. During this time and concerning these matters also, plaintiff had the services of its counsel. No prosecution of anybody was ever undertaken by the State's Attorney as a result of his investigation.
24. On April 16, 1942, after almost two years of negotiation and of continuous discussion amongst plaintiff's directors and with the approval of its counsel, plaintiff and its directors made a settlement with the receiver which was approved by the Superior Court. Under the terms of this settlement, on the one side the plaintiff in 1942 (a) paid the receiver $60,149.23 in cash, of which plaintiff's three directors furnished $15,000 by arrangement with the plaintiff, and (b) consented to the distribution of the Lenox assets at the rate of $60 per share amongst the 1748 shares of Lenox preferred stock held by others than the plaintiff, waiving a right to participate in any such distribution with respect to the 2702 shares of Lenox preferred stock acquired by the plaintiff as set forth in Paragraph 11 hereof; and, on the other side, the receiver (a) paid in cash all the expenses and costs of the receivership and $60 a share on 1748 shares of Lenox preferred and cancelled the certificates for said shares, (b) sold to the plaintiff all of Lenox's assets other than cash hereinafter referred to as the "residual assets," (c) withdrew his action against the plaintiff and the other defendants without costs, and (d) then united with the plaintiff in requesting the court to enter a decree dissolving Lenox, which was accordingly dissolved. At the time, the Lenox estate had $75,744.67 in cash, of which $35,000 was required for the expenses of the receivership plus the residual assets which if valued at $105,411.26 (see Pars. 25 and 26 below) would indicate a net estate of $145,411.26 in which the plaintiff's participating right by reason of its ownership of 2702 out of 4450 shares (60.7%) of the preferred stock would amount to $88,716.65. Thus the value of the right waived by the plaintiff, plus the cash paid, $60,149.23, made an over-all payment by the plaintiff of $133,865.88 which included both the purchase price of the residual assets and the consideration for the settlement. Never, after this settlement, did the plaintiff exercise any of the rights or enjoy any of the privileges of a preferred stockholder of Lenox.
25. The residual assets which plaintiff thus acquired from the receiver consisted of first mortgage notes, second mortgages, real estate both encumbered and unencumbered, and an account in the closed Mechanics Bank. The valuation of these assets on the books of the plaintiff was $104,039.23 as of May 25, 1942. According to the court appraisal in the receivership, adjusted to the time of the settlement with the receiver, the fair market value of said assets was $78,713.70, and according to the court appraisal in the dissolution proceedings previous to the receivership, such valuation so adjusted was $105,411.26. There is no evidence in this case of a higher value for said assets than $105,411.26.
26. At the trial herein, a well-qualified expert appraiser appraised the fair market values of the properties taken over by the plaintiff under the settlement at $98,055. This evidence was not seriously questioned and I find the fair market values as of that date to have been $98,055.
27. The plaintiff's directors were thoroughly familiar with the properties in question through contact with them both before and during the receivership. Throughout the latter period the plaintiff managed said properties as the agent of the receiver. At the time of the settlements, the directors had in mind the value of the receiver's assets brought down to date as appraised by two sets of court appraisers as above stated, and they took this value into account in considering the proposed settlement under which they were to take over the assets of Lenox. The directors wanted to determine how much over and above the value received they were going to have to pay. These men were practiced in appraising Connecticut real estate and were all familiar *893 in a general way with the value of such real estate. They discussed among themselves the question as to what value they would be getting back in taking over the assets. One of the directors who approved the settlement expressed to his associates the opinion that the highest value which could reasonably be put upon the assets was about $105,000.
28. On April 17, 1942, the plaintiff entered into a written agreement of settlement with the committee representing certain former stockholders of Lenox and this agreement, with minor modifications as to the amount to be paid by the plaintiff, was duly performed by the parties to it. Under this agreement in return for effective general releases to the plaintiff and its directors, the plaintiff in 1942 made payments of $70,300 to the committee as follows: (a) $51,415 for the account of those 1469 shares of Lenox preferred previously sold to the plaintiff as stated in Par. 16, supra, the former owners of which had authorized the committee to bring suit to rescind, (b) the further sum of $18,885 for the account of the 540 shares of Lenox preferred, also referred to in Par. 16 above, the owners of which had authorized the committee to represent them for purposes of settlement without suit. These payments enabled the committee to distribute on account of each share the sum of $60 less the purchase price previously paid therefor by the plaintiff.
29. The last transfer of preferred stock of Lenox which appears upon its stock books took place on January 26, 1939. There was no evidence that any sales of shares of the preferred stock of Lenox took place during the year 1942 and there was no quoted market price for it at that time.
30. In 1942, plaintiff also distributed pro rata the sum of $19,800 amongst the former holders of 570 of the 693 shares who were not represented in any way by the committee and who had not expressly threatened suit. From those persons for these payments the plaintiff received general releases in accordance with the plaintiff's offer made by letter on March 13, 1942. The effect of this distribution was to increase from approximately $20 to $55 the amount paid on account of each such share.
31. In 1942, plaintiff paid its counsel the following fees for the following services:

Negotiations with the receiver
 and settlement of his suit (Par.
 24 above) $ 7,500.00
Negotiations with committee and
 settlement with it (Par. 28
 above) 6,000.00
Representing plaintiff in connection
 with an investigation by
 the State's Attorney (Par. 23
 above) 1,000.00
Lawyers' services in general corporate
 matters, 1,500.00
 __________
 Total, $16,000.00

The payment of $7,500 above noted was exclusive of $500 paid in 1942 to counsel for services in connection with the plaintiff's acquisition of the residual Lenox assets as set forth in Par. 24 above. I omit from this finding an item of $340.77 paid to reimburse counsel for their general disbursements because of lack of evidence that the ingredient expenses were incidental to activities in carrying on rather than in new capital investment.
32. In 1942, the plaintiff's three directors who were parties in the litigations above mentioned paid plaintiff's counsel a total of $1,000 for services rendered to them individually in connection with the litigations.
33. In 1941, plaintiff paid its counsel $5,000 for services rendered in connection with the investigation by the Securities and Exchange Commission mentioned above in Par. 22.
34. In 1941, plaintiff paid its accountants, Messrs. A. R. Taylor & Company, $6,620. $912.50 of this was paid for the services of these accountants on the annual audit of plaintiff's books, its annual report to the S. E. C., and its income tax return. The balance of $5,707.50 was for services rendered in 1940 and 1941 in preparation for trial of the suit by the receiver and to obtain data for the hearing held by the Securities and Exchange Commission. The accountants took off transcripts covering a *894 great many properties in which Lenox had been interested, and they also took a transcript of the inter-company account for a long period of years. These services did not in any way bear upon the matter of settlement of the lawsuits.
35. Since the early 1930s it has at all times been the policy of the plaintiff for business reasons not to hold title to real estate, because a large portion of its business was mortgage business and the directors thought it would be a bad business practice to get into competition with the owners of real estate who were seeking mortgages. The plaintiff took over the assets which were in the hands of the receiver of Lenox primarily because only so could the estate be promptly liquidated and the receivership terminated and only on such terms was the receiver willing to settle.
36. The various litigations described above caused much publicity throughout Connecticut and since the nature of the plaintiff's business was such that its success depended on the confidence of the public, including insurance companies, banks and other lenders of money, it was highly important to stop damaging publicity. Among the considerations which moved the plaintiff to enter into the settlements described above were a desire to minimize the risk of loss to its business by stopping this harmful publicity, "the fact" (to use the language of a proposed finding submitted in behalf of the plaintiff) "that the cost of settlement might be less than the damages which the plaintiff might have to pay if the suits went to judgment" and a desire to avoid the cost of litigation having in mind that such litigation involved a serious drain on the productive time of its executives as well as on the corporate treasury.
37. The plaintiff made the payments of $19,800 as stated in Par. 30 above to the former holders, 61 in number, of 570 shares who had not taken a position expressly antagonistic (a) because it had the opinion that these former stockholders were equitably entitled to a treatment approximating that accorded to those represented by the committee, (b) because they thought that without settlements these former stockholders might thereafter bring suit even though they as yet had made no claims, and (c) because 39 of these 61 former stockholders were investors in mortgage notes issued to the plaintiff as trustee for noteholders whose good will as customers of the plaintiff it was desirable to retain.
38. The plaintiff and its directors knew that the former stockholders of Lenox preferred stock who were represented by the committee were apprised of the fact that they had claims for damages as well as claims for rescissions and that, although the committee represented them only to accomplish a rescission, without a settlement actions for damages by these stockholders might be brought as well.
39. The payments set forth in Paragraphs 28, 30, 31, 33 and 34 were made by the plaintiff not to protect its title to specific property but rather to protect its overall business from loss and injury and with good ground for the belief that they would be helpful and conducive to that end. So, also, as to the sum of $28,454.62 that being so much of the total cost to the plaintiff of the settlement set forth in Par. 24 as exceeded the value of the Lenox assets taken over by the plaintiff under the settlement at the highest valuation ($105,411.26, see Par. 25) of which there was evidence.
40. The payments enumerated in Par. 39 were such as are frequently and ordinarily made by business men for the protection of their business and in the proper and normal conduct thereof: they were ordinary as well as necessary expenses in carrying on the plaintiff's business.

Conclusions of Law.
I. The payments in question as enumerated in Par. 39 were not capital expenses within the scope of Regulation 111, Sec. 29.24-2, which provides: "the cost of defending or perfecting title to property constitutes a part of the cost of the property and is not a deductible expense."
II. The payments in question as enumerated in Par. 39 were all necessary and ordinary expenses incurred in carrying on the plaintiff's business within the meaning of Sec. 23(a) (1), 26 U.S.C.A.Int.Rev. Code, and the disallowance of said payments *895 as deductions from plaintiff's income for 1941 and 1942 was erroneous.
III. The plaintiff is entitled to judgment for the recovery of the taxes which under the Conclusions just stated were erroneously assessed and collected, with interest.
HINCKS, District Judge.
It is to me altogether plain that the net payment made to the Lenox receiver, Par. 24, was not one made to defend plaintiff's title and on that account a capital expense under Regulation 111. The receiver here, unlike the taxpayer's claimant in Levitt & Sons, Inc., v. Nunan, 2 Cir., 142 F.2d 795, Id., 2 Cir., 160 F.2d 209, made no claim hostile to plaintiff's title: he claimed only an accounting of profits alleged to have accrued to the plaintiff at the expense of Lenox. In this aspect, the case here falls within the rule not of the Levitt case but of Hochschild v. Commissioner, 2 Cir., 161 F.2d 817, and Rassenfoss v. Commissioner, 7 Cir., 158 F.2d 764. See also All States Freight, Inc., v. United States, D.C., 72 F.Supp. 673; Bishop Trust Co., Ltd., v. Commissioner, 47 B.T.A. 737; and Seufert Bros. Co. v. Lucas, 9 Cir., 44 F.2d 528. Indeed, it will be noted that the treatment of the payment to the receiver in this case as an expense of carrying on does not conflict with the views enunciated in Judge Frank's dissenting opinion in the Hochschild case, supra.
Nor did the plaintiff's net payment to the receiver lose its inherent quality as an operating expense because it happened to be linked or merged in a single transaction with a contra-item, namely a transfer of the residual Lenox items to the plaintiff. True, the over-all payment included the consideration for the plaintiff's purchase of the residual assets which the plaintiff, to obtain a settlement, was required to take over and so much of the payment as represented the consideration paid by the plaintiff for these assets was concededly a capital  not an operating  expense. But merely because the parties to that transaction did not attempt to apportion the total payment between capital and operating expenses for purposes of a settlement which for its consummation depended not at all upon any such apportionment, it does not follow that the payment may not be apportioned for the purpose of an ascertainment of taxes which does depend upon an apportionment. In Hochschild v. Commissioner, 7 T.C. 81, the Tax Court recognized the propriety of making a more difficult apportionment of a blanket expenditure for capital and operating items than is involved here. On appeal, 2 Cir., 161 F.2d 817, the apportionment sanctioned by the Tax Court was expressly approved in Judge Frank's dissent and not disapproved in the opinion of the court. See also Helvering v. Stormfeltz, 8 Cir., 142 F.2d 982.
Here, the apportionment for which the plaintiff contends has a basis which is at once obvious and simple. The fair value of the assets taken over needs but to be subtracted from the over-all payment and what is left represents that part of the payment which was made to protect the business by a settlement. By this method, of course, the measure of the deductible payment would vary inversely with the value allocated to the assets. But since the plaintiff is content for present purposes to have its deductible payment determined by subtracting from the over-all payment the highest value of the residual assets of which there is evidence (indeed, a figure somewhat in excess of what I have found to be actual value) the result is beyond the reach of exception by the defendants.
Whether the payments to settle actual and potential claims in behalf of former holders of Lenox preferred stock should also be classified not as capital but rather as operating expenses, is a closer question. Here, as often is the case in similar situations, the payments were made before the precise theory of the claims had been fully articulated. It does appear, however, that the claimants contemplated a judicial rescission of their stock sales to the plaintiff and considered that they had a claim for damages as well. Of course, a successful rescission would result in an avoidance of the plaintiff's title to the stock involved in the challenged transaction and I have little doubt that a payment made solely to prevent such an avoidance would be one to defend title within the meaning of Regulation 111 just as fully as the payment made to *896 prevent a loss of title by the foreclosure of the equitable lien in the Levitt case, supra. But because its decision was based upon that one feature of a complex situation the Tax Court in the Hochschild case was reversed, the Court of Appeals holding that where the threat to the taxpayer's title depended for its validity upon a claimed breach by the taxpayer of a fiduciary duty the threat to title is incidental only and a payment to settle the claimed breach of duty should be treated as an expense to protect the business generally.
Essentially the same situation is involved here. The settlement with the committee for the benefit of former stockholders and the settlement with the receiver were essentially all part of the same transaction: if, failing a settlement, the committee had accomplished its threatened rescission in behalf of former stockholders the amount of the outstanding Lenox stock held by others than the plaintiff and consequently the aggregate amount of the adverse interest entitled to participate under the claims of the receiver, would have been correspondingly increased. Likewise, as to the plaintiff's settlement with former stockholders not represented by the committee. This settlement was on the basis of a firm written offer made prior to the execution of the agreements of settlement with the receiver and the committee and in effect constituted an integral part of a comprehensive settlement. But for this offer, and its acceptance and subsequent consummation, the plaintiff had sound ground for fear lest the aggregate amount of adverse claims might be increased from this source also. And former stockholders, unless their continued acquiescence was assured by firm prospect of a settlement, by claiming a right to rescind their sales to the plaintiff might have had sufficient standing in the receivership proceedings to block the settlement between the plaintiff and the receiver. Although the written agreement of settlement with the receiver did not expressly say so, it is a fair inference that the terms of that settlement were based upon an understanding on both sides that both the actual and potential claims of former stockholders would also be settled. There was little incentive for the plaintiff to settle with the receiver for the benefit of present stockholders unless the possibility of harmful publicity from litigation prosecuted for the benefit of former stockholders was also eliminated, and indeed the first negotiations for a compromise were conducted on the basis of an offer for an over-all settlement which included the claims both of the receiver and of former stockholders.
Not only were the payments for the benefit of former stockholders thus tied into an over-all settlement but also, it appears, the basis of these payments was not essentially different from that made to the receiver. These claims were stimulated by the hope that the claims of the receiver could be made good; the value of these claims, like the value of the receiver's claim, depended upon the possibility that, if litigation which involved publicity harmful to plaintiff's business proceeded, a decree might result enlarging the Lenox estate at the expense of the plaintiff's on the ground that the plaintiff had profited by a breach of the fiduciary duty owed by the common directors to Lenox.
On the whole these considerations distinguish the case here from the Levitt case and bring it within the ruling in the Hochschild and Rassenfoss cases. This, without reliance upon a ruling as extreme as that of Helvering v. Community Bond & Mortgage Corp., 2 Cir., 74 F.2d 727. And it would, I think, produce a result almost grotesque to treat the payments made for the benefit of former stockholders as a belated addition to capital cost when the payment to the Lenox receiver for the benefit of present stockholders was plainly an operating expense. I conclude, therefore, that the payments for the benefit of former stockholders as well as the net payment to the receiver should not be treated as capital expenses.
With the conclusions stated out of the way, there is little difficulty in reaching the cognate conclusion that on the underlying facts all the payments in settlement were both necessary and ordinary within the meaning of the Revenue Act. International Shoe Co. v. Commissioner, 38 B.T.A. 81. Beyond dispute, the settlements removed serious hazard of loss and thus were helpful to the plaintiff's business. *897 In this aspect, therefore, the payments were "necessary" within the pronouncements of Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212, and Levitt & Sons v. Nunan, 2 Cir., 142 F.2d 795. And clearly the hazard to the plaintiff's business from the pending and threatened litigation was such that in the world of business affairs the payments constituted a "common and accepted means of defense" and so qualified as an "ordinary" expense of the business within the definition of the Welch case [290 U.S. 111, 54 S. Ct. 9]. Indeed, in this aspect the case is considerably stronger for the plaintiff than other cases which might be cited in its support. Cf. Dunn & McCarthy, Inc., v. Commissioner, 2 Cir., 139 F.2d 242.
Nor is the deductability of the plaintiff's payment to the receiver affected by the fact that to obtain their personal release the plaintiff's officers, who were also Lenox' officers, on some undisclosed basis contributed $15,000 in cash to the settlement with the receiver, in addition to the payment made by the plaintiff. It will be remembered that the tenor of the receiver's claim was to the effect that the plaintiff knowingly had profited by the acts of the common directors which were in violation of their duty to Lenox. If such a claim were well-founded, the plaintiff would be jointly liable with its recreant officers to account for all profit thus derived. In such a situation, the coincidence of a joint liability would not destroy the deductability of payments made by the plaintiff for the discharge of its own liability. Howard v. Commissioner, 22 B.T.A. 375, at page 378. See also Watkins Salt Co. v. Commissioner, 1 T.C. 125. If it be important in this connection  which I doubt  it may be noted that under the common law of Connecticut no right of contribution is recognized between joint tort feasors. Sparrow v. Bromage, 83 Conn. 27, 74 A. 1070, 27 L.R.A.,N.S., 209, 19 Ann.Cas. 796, and Rose v. Heisler, 118 Conn. 632, 174 A. 66.
If the payments in settlement were deductible, as I have held, it follows, of course, that the payments to counsel for services in accomplishing the settlements were also deductible. This is a corollary not disputed by the defendants and needs neither citation of authority nor exegesis. Likewise as to all payments to accountants, as well as to counsel, for services not related to the settlements or investigations but in connection with the general conduct of the defendant's business.
The defendants, I note, question the payments to counsel for services in connection with the investigation of the plaintiff's affairs by the State's Attorney and by the Securities and Exchange Commission. This challenge is predicated, in part at least, upon a line of cases, such as Commissioner v. Longhorn Portland Cement Co., 5 Cir., 148 F.2d 276, 277, holding that payment in discharge of fine or of a statutory penalty is not deductible as an ordinary expense of carrying on a business. But such doctrine is not applicable here where no question of fine or penalty is involved. Nor could it conceivably be held that a settlement with the receiver which was judicially approved in the receivership proceedings was one effective to "frustrate sharply defined public policy" within the scope of the Longhorn case. The defendants also cite in opposition to these deductions Knight-Campbell Music Co. v. Commissioner, 10 Cir., 155 F.2d 837, and Chenango Textile Corp. v. Commissioner, 1 T.C. 147, affirmed 2 Cir., 148 F.2d 296. But in both of these cases, the only counsel fees payments for which were held non-deductible as business expenses were those of counsel retained by, and for the benefit of, others than the taxpayer; the payment of taxpayer's counsel fees was not involved at all in the Music Company case; and in the Chenango case the payment of services of taxpayer's counsel was held deductible.
Thus I reach my conclusion that all the payments ($16,000) described in Par. 31 and the payments of $5,000 and $6,620 described in Pars. 33 and 34 were also deductible.
The plaintiff may submit for entry a judgment which shall embody the rulings indicated above together with any further *898 findings which may be necessary to show the amount of taxes recoverable for each taxable year in question as a result of said rulings, said judgment and supplemental findings to be settled in chambers on notice unless notice shall be waived.