**INDUSTRIAL AGGREGATE COMPANY,**
a corporation, Appellant,

v.

**UNITED STATES of America,**
Appellee.

**No. 16346.**

United States Court of Appeals
Eighth Circuit.

Nov. 29, 1960.

Hayner N. Larson, Minneapolis, Minn., for appellant; and Jack D. Gage, Minneapolis, Minn., on the brief.

C. Guy Tadlock, Atty., Dept. of Justice, Washington, D. C., for appellee; and Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Robert N. Anderson, and Fred Youngman, Attys., Dept. of Justice, Washington, D. C., and Fallon Kelly, U. S. Dist. Atty., St. Paul, Minn., on the brief.

Before SANBORN, WOODROUGH and BLACKMUN, Circuit Judges.

BLACKMUN, Circuit Judge.

This corporate taxpayer, Industrial Aggregate Company, has sued to recover a portion of the federal excess profits tax it paid for the calendar year 1951. The trial court dismissed the taxpayer's complaint and this appeal followed.[1]

Whether the taxpayer is entitled to prevail depends upon the tax treatment to be afforded to items aggregating $102,110.07 paid by it in 1952. If, in the determination of the taxpayer's net

1. The court below filed no formal opinion. Its findings and conclusions were accompanied by a memorandum reading as follows:

"Whether the taxpayer will be allowed to deduct its expenditures totaling $102,110.07 incurred as a result of litigation brought in the local court as a business expense under Section 23(a) (1) (A) of the 1939 Internal Revenue Code depends, as both parties agree, on the essential or primary purpose of that litigation. The settlement agreement precludes a conclusive finding either way on this point. The circumstances leading to the institution of the action indicate that the lessor was not as concerned with the alleged defaults as it was with the requested extension under the lease. However, conjecture is not the province of this Court. From the evidence presented, I find that the taxpayer has not carried its burden of establishing that its methods of doing business, rather than its right to continuing occupancy of the premises, was the basic purpose of the suit. It follows that the taxpayer is not entitled to claim a business deduction for the expenditures under Section 23(a)."

income for that year, these items are deductible as expenses under § 23(a) (1) (A), as amended, of the Internal Revenue Code of 1939, 26 U.S.C.A.,[2] that deduction results in an unused excess profits credit for 1952. This credit is then carried back to 1951 and applied in redetermining the taxpayer's 1951 adjusted excess profits net income with consequent lowering of the excess profits tax payable by it for that year. § 430 et seq., as amended, of the 1939 Code, as added by the Excess Profits Tax Act of 1950, 26 U.S.C.A. The difference in tax is the amount now in controversy.

The taxpayer's position is that the items qualify as such deductions. The government's position is that they do not and that the items, although recoverable over the life of the extended leases herein described (see, for example, Main & McKinney Bldg. Co. v. Commissioner, 5 Cir., 113 F.2d 81, certiorari denied 311 U.S. 688, 61 S.Ct. 66, 85 L.Ed. 444), are specifically nondeductible under § 24(a) (2) of the 1939 Code, 26 U.S.C.A.,[3] and under Section 39.24(a)–2[4] of Regulations 118 applicable to the taxable year 1952.

There is little dispute about the facts. The taxpayer since 1936 has been in the business of removing sand, gravel and other materials from land in an industrial area in the City of Minneapolis. It files its income tax returns on the accrual method of accounting and its taxable year is the calendar year. The land in question has been owned, since prior to 1951, by Oakland Heights Company, a corporation. The taxpayer is assignee of the rights of prior lessees of that land under four separate leases dated Sep-tember 28, 1911, July 1, 1918, March 17, 1921, and December 31, 1929, as amended, and called Leases Nos. 1, 2, 3 and 4, respectively. The lessor in the first three of these leases was Chute Brothers Company. Oakland acquired the Chute interests in these leases; it is itself the lessor in the 1929 lease.

Each of the four leases provides for the removal of sand and gravel by the lessee and had a December 31, 1951, termination date. Each contains the following paragraph:

"If at the end of this lease, viz., December 31, 1951, the lessee having complied in full with its part of this agreement according to its true and fair intent and spirit, there shall remain unremoved from any of the said property sufficient of said sand, gravel or boulders to make it commercially practicable to continue the operation of the property for the purposes herein specified the lessee shall be allowed such reasonable additional time, not exceeding ten years, as may be fairly necessary in which to complete the removal of said materials, the same to be done in the manner and in full accordance with the intent and spirit of this instrument as designated for the period ending December 31st, 1951;— provided, however, that the lessee give to the lessor written notice of the requirement of such additional time at least one year previous to December 31st, 1951."

Lease No. 4 also provides:

"In case of default on the part of the lessee in full compliance with any of its covenants or agreements

---

**2.** "§ 23 Deductions from gross income. In computing net income there shall be allowed as deductions:

"(a) Expenses.

"(1) Trade or business expenses.

"(A) In general. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *"

**3.** "§ 24(a) General rule. In computing net income no deduction shall in any case be allowed in respect of— * * *

"(2) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate, * * *."

**4.** "§ 39.24(a)–2. Capital expenditures— (a) * * * The cost of defending or perfecting title to property constitutes a part of the cost of the property and is not a deductible expense. * * *"

under this lease or under the said Leases Nos. 1, 2 or 3, respectively, the lessor may terminate this lease by giving the lessee at least sixty (60) days written notice of its intention so to do; and unless within such sixty (60) days the defaults specified in such notice are removed by the lessee, then from and after the expiration of said sixty (60) days all right, title, and interest on the part of the lessee under this lease and in and to said premises and every part thereof shall thereby cease and terminate, and the premises shall thereupon be surrendered to the lessor."

A similar provision is in each of the three earlier leases but is restricted in its application to defaults under the particular lease.

The first three leases have operating provisions requiring the lessee (a) diligently, as justified by the market, to remove and sell merchantable materials found on the premises; (b) to place all stripping in compact and convenient form upon the land and classified according to kind; and (c) to remove materials from the premises in as compact form as conditions permit and in such reasonable order of priority as the lessor designates. Lease No. 4 contains similar provisions; these are somewhat more specific, however, and provide, among other things, that the lessee plan and conduct its operations so as to leave the premises "in as usable and level condition as practicable." By the leases the taxpayer is obligated to pay royalties (with a minimum specified) and, apparently, the taxes and assessments upon the land.

As 1951 approached, Oakland and the taxpayer attempted to invoke the respective termination and extension provisions of the four leases:

1. On May 27, 1948, Oakland sent a letter to the taxpayer.[5] This letter disclosed that the parties had had prior discussions regarding the taxpayer's compliance with the operating provisions of the leases. It stated that whether there had been full compliance might not be fully apparent until the leases expired at the end of 1951 and Oakland definitely asserted that the taxpayer did not then, viz., at the time the letter was written, have the right to extend the leases. It suggested the making of a new agreement between the parties which would include the amendment of the leases to extend their term for twenty years, to adjust the royalty payments upward, and to effect other changes. The letter concluded with the following: "We desire equally to settle now once and for all differences of opinion as to contract interpretations that have existed between you and us in the past, and to obviate so far as possible any disagreements in the future." [6] Another letter, dated June 24, 1948, passed from Oakland to the taxpayer but is not in the record. On July 9, 1948, the taxpayer replied to these two letters. It stated that the suggested changes in the leases were unacceptable, that "We will not be coerced into these concessions by the threat of your refusal to agree to an extension of the gravel leases", and that the lessee's obligations thereunder had been fully performed.

On October 29, 1951, Oakland sent the taxpayer a notice of intention to terminate and cancel all four leases upon the expiration of sixty days or, in effect, at the end of 1951 unless specified defaults were removed within that time. The defaults asserted concerned the operating provisions of the leases. Specifically alleged were the covering of "great quantities of merchantable sand and gravel", the throwing of "stripping in great uneven piles", the creation of "an enormous

5. The taxpayer objected, on the grounds of irrelevancy and immateriality, to the introduction in evidence of this letter of May 27, 1948, and of the later letters of July 9, 1948, and December 26, 1951. This motion appears to have been denied by the trial court.

6. It is not disputed that if a breach of the covenants under the leases had occurred, Oakland could have sued the taxpayer for damages before the expiration of the leases' term.

mound of tailings" on top of merchantable material, the failure to leave the premises in a usable and level condition, the commission of waste, and the failure to comply with the "true and fair intent and spirit" of the leases. On December 26, 1951, Oakland's attorneys wrote the taxpayer's attorneys suggesting a new lease of the premises and additional acreage to begin January 1, 1952, and to provide for a ten year term, the release of claims, a higher level of royalties, and other details.

2. Meanwhile, on December 14, 1950, the taxpayer gave Oakland the year's written notice, required under all four leases, that on December 31, 1951, the circumstances would be such that the taxpayer will be entitled to and will require additional time after that date to continue its operations. The effect of the notice, if valid, was to extend the taxpayer's right of occupancy until December 31, 1961, or such earlier date as the removal of materials was completed.

On December 29, 1951, Oakland gave the taxpayer a notice of termination and demanded possession of the premises. Simultaneously the taxpayer was served with a summons and complaint in an action brought against it by Oakland in state court. By its complaint Oakland alleged defaults in the operating provisions of the leases, the commission of waste, and the consequent downgrading of the market value of the leased premises, and demanded judgment (a) of forfeiture of the estate and taxpayer's eviction from the property, (b) for rent due December 31, 1951, (c) for treble damages, amounting to $490,050.00, for waste under Minnesota Statutes, § 561.17, M.S.A., and (d) for other relief "including damages for trespass". The taxpayer in its answer denied the alleged defaults, claimed that in any event Oakland had waived them, and asserted two counterclaims upon which it requested equitable relief against forfeiture and a declaratory judgment that the leases had been duly extended.

This state court litigation did not come to trial. It was settled on December 15, 1952, upon a stipulation reciting that the taxpayer paid Oakland $75,000 "in full payment and discharge of all damages claimed or suffered by" Oakland "provided, however, that" this was not to be "construed as an admission on the part of the defendant that any such damages had been incurred"; dismissing Oakland's causes of action with prejudice; and authorizing the entry of judgment which would provide, among other things, that the four leases had been duly extended for a period not to exceed ten years after 1951 and that the taxpayer "was at all times since it entered into possession of said premises, and now is, lawfully in possession, and entitled to possession, of the premises described in said leases". The state court entered judgment accordingly.

The $75,000 paid by the taxpayer to Oakland in 1952 pursuant to this stipulation and the taxpayer's payment, also in 1952, of $27,110.07 in fees and expenses it incurred in this state court litigation comprise the $102,110.07 total now in controversy.

The dismissal of the complaint by the court below was on the ground that the taxpayer had failed to carry its burden of establishing that "the basic purpose" of the state court suit against it was "its method of doing business, rather than its right to continuing occupancy of the premises." It found that because of the stipulation "it is impossible to determine the essential or primary purpose of that litigation".

In the trial court the parties stipulated that the judgment roll in the state file (Hennepin County, Minnesota, District Court File No. 486332) "shall be deemed offered in evidence, and the Court is by the parties requested to take judicial notice of all portions of said judgment roll not included in the record in this cause by or as a part of the pleadings." After the entry of judgment the taxpayer moved for an order opening the record and providing that the full contents of the state file "be deemed offered and received in evidence". This was supported by an affidavit which sought "in effect to

enlarge the foregoing portion of said stipulation so as to cause the entire contents of said File * * * to be deemed offered and to be received in evidence". Specifically the taxpayer desired to present, in view of the court's conclusion as to *Oakland's* purpose and concern, memoranda filed by Oakland in the state court action in support of its motion to dismiss the taxpayer's counterclaims. The taxpayer felt that these clearly revealed Oakland's purpose in instituting the action. This motion was overruled.

The taxpayer assails here the validity of the trial court's expressed reasons for its conclusion, namely, that Oakland's primary concern was with the "requested extension under the lease" and that the stipulation rendered it impossible to determine the primary purpose of the litigation; it also asserts that in any event Oakland's suit had to do with taxpayer's *use* of the premises and that any attack upon taxpayer's *title* under the leases was only indirect and thus did not disqualify the expenditures as tax deductions.

The government argues that expenditures made for the acquisition or defense of title are capital items; that the taxpayer's purpose in effecting the settlement and the payments in connection therewith is controlling; that this purpose is difficult to ascertain where we have a settlement of an action based on multiple grounds of recovery; that what the taxpayer desired and attained was the recognition of its right to continued occupancy; and that it did not sustain its burden of proof to show otherwise.

■ It is settled, of course, that the taxpayer in this refund action has the burden of proving that it has overpaid its tax, Lewis v. Reynolds, 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293; Willcuts v. Minnesota Tribune Co., 8 Cir., 103 F.2d 947, 951, certiorari denied 308 U.S. 577, 60 S.Ct. 93, 84 L.Ed. 483; Blansett v. United States, 8 Cir., 283 F.2d 474, 479, or, in other words, of establishing its right to its claimed deductions. Interstate Transit Lines v. Commissioner, 319 U.S. 590, 593, 63 S.Ct. 1279, 87 L.Ed. 1607; Mississippi River Fuel Corporation v. Koehler, 8 Cir., 266 F.2d 190, 196, certiorari denied 361 U.S. 827, 80 S.Ct. 75, 4 L.Ed.2d 70.

With this background we look at the statute. § 23(a) (1) (A) and § 24(a) (2) taken together provide that if the expenditures in question are to be deductible they must be (a) ordinary and necessary; (b) paid or incurred during the taxable year; (c) paid or incurred in carrying on any trade or business, and (d) other than "permanent improvements or betterments made to increase the value of any property or estate". Sec. 39.24(a)–2 of Regulations 118 would add to these requirements the refinement that the expenditures not be incurred in "defending or perfecting title to property".[7]

■ The decided cases, including our own, have given recognition and impetus to this standard of the regulation and hold generally that expenditures made in defense or perfection of title are capital items and are not deductible as expenses from gross income. Addison v. Commis-

---

7. This regulation is an old and repeated one and has been held to be valid and to have the force of law. Porter Royalty Pool v. Commissioner, 6 Cir., 165 F. 2d 933, 936, certiorari denied 334 U.S. 833, 68 S.Ct. 1347, 92 L.Ed. 1760; Jones' Estate v. Commissioner, 5 Cir., 127 F. 2d 231, 232; Bush Terminal Bldgs. Co. v. Commissioner, 2 Cir., 204 F.2d 575, 578, certiorari denied 346 U.S. 856, 74 S. Ct. 72, 98 L.Ed. 370. A similar provision appears in Sec. 39.23(a)–15 of Regulations 118 relating to an individual's non-business expenses under § 23(a) (2) of the 1939 Code. § 23(a) (1) (A) and

§ 23(a) (2) have been held to be *in pari materia*. Trust of Bingham v. Commissioner, 325 U.S. 365, 373, 65 S.Ct. 1232, 89 L.Ed. 1670; Sergievsky v. McNamara, D.C.S.D.N.Y., 135 F.Supp. 233, 238; see Davis v. Commissioner, 8 Cir., 151 F.2d 441, 443. Although the taxpayer in its argument at least mildly questions the ultimate implications, and hence the validity, of the regulations so far as title defense costs are concerned, as contrasted with title perfection costs, we accept this title defense standard for purposes of this case and assume that it is valid.

sioner, 8 Cir., 177 F.2d 521, 523, 23 A.L.R.2d 897; see Helvering v. Stormfeltz, 8 Cir., 142 F.2d 982, 984.[8] This rule has been applied where the property concerned consists of leasehold interests. Bush Terminal Bldgs. Co. v. Commissioner, 2 Cir., 204 F.2d 575, 578, certiorari denied 346 U.S. 856, 74 S.Ct. 72, 98 L.Ed. 370; Blackwell Oil & Gas Co. v. Commissioner, 10 Cir., 60 F.2d 257, 258; McDuffie v. United States, 19 F. Supp. 239, 247, 85 Ct.Cl. 212.

 At the same time, ever since Kornhauser v. United States, 276 U.S. 145, 48 S.Ct. 219, 72 L.Ed. 505, cases recognize that the mere fact that title to property happens to be involved in litigation does not necessarily mean that expenditures of that litigation are automatically rendered non-deductible by the regulation. An example is Levitt & Sons v. Nunan, 2 Cir., 142 F.2d 795, 797. Practicality and substance are to be recognized.[9] The test which appears to have been established is that of *primary purpose*. Thus, if the primary or sole purpose of the suit is to perfect or defend title, the expenditures are not deductible. Shipp v. Commissioner, 9 Cir., 217 F.2d 401, 402; Lewis v. Commissioner, 2 Cir., 253 F.2d 821, 827–828; Garrett v. Crenshaw, 4 Cir., 196 F.2d 185, 187; Addison v. Commissioner, 8 Cir., supra, at page 523 of 177 F.2d. On the other hand, even though title may be involved, if its defense or perfection is not the primary purpose of the litigation, the expenditures do not encounter the barrier of the regulation's standard and they may qualify instead as ordinary and necessary expenses. Rassenfoss v. Commissioner, 7 Cir., 158 F.2d 764, 767–768; Sergievsky v. McNamara, D.C.S.D.N.Y., 135 F.Supp. 233, 237–238; Straub v. Granger, D.C.W.D.Pa., 143 F.Supp. 250, 254–255.[10]

 In applying these rules to the facts here, it is to be observed that no question is raised on this appeal (1) as to the validity of the expenditures in question; (2) as to the propriety of their allocation to the taxable year 1952; (3)

8. Among many other similar holdings are Levitt & Sons v. Commissioner, 2 Cir., 160 F.2d 209, 210; Lewis v. Commissioner, 2 Cir., 253 F.2d 821, 827; Bowers v. Lumpkin, 4 Cir., 140 F.2d 927, 928–929, 151 A.L.R. 1336, certiorari denied 322 U.S. 755, 64 S.Ct. 1266, 88 L. Ed. 1585; Garrett v. Crenshaw, 4 Cir., 196 F.2d 185.

9. In this connection, one must recall Mr. Justice Cardozo's wistful observation in 1933 concerning provisions in preceding Revenue Acts parallel to § 23(a) (1) (A): "One struggles in vain for any verbal formula that will supply a ready touchstone. The standard set up by the statute is not a rule of law; it is rather a way of life. Life in all its fullness must supply the answer to the riddle". Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212.

10. The line of demarkation between these two classes of cases may not always be readily apparent. The Seventh Circuit in Rassenfoss, supra, 158 F.2d at page 766, described it as "extremely narrow" and said that "in some of the cases it appears to have been drawn on an arbitrary rather than on a basis of reason or logic"; this observation was noted in Sergievsky, supra, 135 F.Supp. at page 237. Again the Seventh Circuit, in Kelly v. Commissioner, 7 Cir., 228 F.2d 512, 514, said that it "has given the courts considerable difficulty." Other cases say that the dividing line is often "difficult to discern". Boulder Building Corporation v. United States, D.C.W.D.Okl., 125 F.Supp. 512, 514; Straub v. Granger, supra, 143 F.Supp. at page 254. And on still other occasions courts, after stating the rule, announce, as is not infrequently the situation, that each case must be examined and decided upon its own facts. Commissioner of Internal Revenue v. Heininger, 320 U.S. 467, 473, 64 S.Ct. 249, 88 L.Ed. 171; Brown v. Commissioner, 5 Cir., 215 F.2d 697, 699. This, indeed, is the way the government in its brief here would distinguish the cases which the taxpayer claims support its position. We suspect, however, that any difficulty may be more apparent than real, for many cases which apply the standard of the regulation readily distinguish Rassenfoss and its companion cases and do not disagree with them. See, for example, Safety Tube Corp. v. Commissioner, 6 Cir., 168 F.2d 787, 790; Brown v. Commissioner, supra; Garrett v. Crenshaw, supra; and our own case of Addison v. Commissioner, supra, at page 523 of 177 F.2d.

as to their trade or business character; (4) as to their amount; (5) as to any distinction between the $75,000 settlement figure and the $27,110.07 figure for attorney's fees and expenses; and (6) as to the taxpayer's being entitled to the refund claimed if the expenditures qualify as deductions. This case thus comes down to the question whether the expenditures were "ordinary and necessary", [11] within the meaning of § 23(a) (1) (A), and hence are deductible, or were, on the other hand, amounts paid "for permanent improvements or betterments made to increase the value of any property or estate" under § 24(a) (2), or for "defending or perfecting title to property" under Sec. 39.24(a)–2 of the Regulations, and are therefore not deductible. It is clearly, then, a situation for the application of the test of purpose.

How and where is the governing purpose to be found? Is it to be determined from the pleadings, from the evidence or, as the trial court seems to prefer here, from the stipulation for settlement? And whose purpose is to govern? Is it that of the taxpayer's opposition in instituting the litigation against it or is it that of the taxpayer in defending it, or is it the purpose of either party, or both, in effecting settlement? These are not easy questions to answer.[12] We might be inclined to the view that what is controlling is the taxpayer's purpose, in the aggregate, in taking all such steps as it feels are necessary or advisable to effect its desired result. To ascertain this, we may be driven, as here, to look intently at the taxpayer's opposition's apparent purpose in instituting the litigation. In any event, we are able to say here with conviction that whether one emphasizes the pleadings, the evidence or the settlement stipulation, and whether one looks to the taxpayer or to Oakland, the result on the facts before us is the same.

█ We observe again that Oakland's complaint in the state court was directed to alleged failures on the part of the taxpayer to perform the operating provisions under the four leases. It alleged the consequent devaluation of the market value of the premises for use as industrial sites and sought forfeiture and eviction, rentals due, treble damages for waste, and damages for trespass. This in turn rested upon the termination notice of October 29, 1951, which made similar reference to violation of the operating provisions and which specifically alleged instances of malfeasance by the taxpayer in those operations and the commission of waste.

If purpose of this state court litigation can be gleaned from the pleadings, cf. Zahn v. Transamerica Corporation, 3 Cir., 162 F.2d 36, 48, 172 A.L.R. 495, it seems to us that the complaint and the answer show that Oakland's essential purpose was to obtain remuneration for damages and that the taxpayer's purpose was to resist that claim. Almost a half million dollars in treble damages alone were asserted. It must be acknowledged

---

11. "Ordinary in this context does not mean that the payments must be habitual or normal in the sense that the same taxpayer will have to make them often." Welch v. Helvering, 290 U.S. 111, 114, 54 S.Ct. 8; Deputy v. DuPont, 308 U.S. 488, 495, 60 S.Ct. 363, 84 L.Ed. 416.

12. The cases reveal differing approaches. Thus in Kornhauser v. United States, 276 U.S. 145, 48 S.Ct. 219, 72 L.Ed. 505, the court looked to the issue in the prior litigation. In Straub v. Granger, supra, the purpose for which the taxpayer consulted and retained counsel was emphasized. In Rassenfoss v. Commissioner, supra, the court was impressed with plaintiff's purpose in suing the taxpayer and gave weight to the settlement in compromise. In Sergievsky v. McNamara, supra, the court turned to the nature of the relief sought. In the Levitt & Sons cases, supra, 142 F.2d 795, and 160 F.2d 209, the court looked to the intent of the taxpayer in settling the suit. In Hales-Mullaly v. Commissioner, 10 Cir., 131 F.2d 509, 512, the court was impressed by the nature and basis of the alleged liability of the taxpayer. In Boulder Building Corporation v. United States, supra, the controlling purpose and real "issue between the parties" were ascertained from the time at which the controversy came into being.

that forfeiture of the estate of the taxpayer and its eviction were also requested and numerically constituted the first relief urged in the prayer. That aspect of the suit, however, seems to be an obvious retort to the taxpayer's extension notice of the year before and an attempt to jar the taxpayer into a realization of the seriousness of Oakland's claims as to improper use. The pleadings alone, it therefore seems to us, have as their primary purpose the issue of damage claims in contra-distinction to an issue of adverse claims to the leaseholds' title.

There was nothing which developed in the proceedings before the trial court which made the pleadings any less pertinent on the issue of purpose.

The government, however, as has been noted, urges that the purpose which is significant and which should govern here is that of the taxpayer in effecting settlement of the litigation and that the written stipulation of settlement precludes a conclusive finding. We cannot agree. We see nothing in the stipulation which changes or affects in any way the conclusion reached as to the purpose of the litigation which is so evident from the pleadings. The stipulation described the $75,000 as "in full payment and discharge of all damages claimed or suffered by" Oakland, although it also contained the usual recital that this was not an admission by the taxpayer that any such

damage in fact had been incurred. It then proceeded to incorporate provisions as to Oakland's dismissal of all its causes of action with prejudice, as to the due extension of the leases, as to the taxpayer's past and present lawful possession under the leases, and as to Oakland's acceptance of the taxpayer's tenders of royalties and reimbursement for taxes and assessments. Instead of confusing the issue, the stipulation, it seems to us, reinforces and makes imperative what we regard as the only possible conclusion as to the purpose of the litigation.[13]

Thus the pleadings themselves, the agreed facts and the stipulation for settlement all compel the conclusion that the *primary* purpose of Oakland's institution of the state court litigation, of the taxpayer's defense of it, and of both parties in effecting the settlement, was one and the same, namely, the resolution of the issue of the taxpayer-lessee's alleged violations of the operating covenants of the four leases. That the determination of this issue involved the taxpayer's consequent right, or lack of right, to the extension, and thus involved continuing title to the leaseholds as extended, does not make this purpose any less primary.[14]

We feel that this conclusion finds worthy precedent in the following cases where comparable expenses have been allowed as deductions from gross income under § 23(a) (1) (A) or § 23(a) (2),

13. Compare the comment in Rassenfoss, supra, at page 767 of 158 F.2d, that a conclusion that the question of title was merely incidental "is borne out by the compromise which was finally effected, by which Campbell was awarded an almost infinitesimal and only a limited interest in the partnership". Here Oakland by the compromise succeeded in effecting no change whatever in the leases.

14. While this determination makes it unnecessary for us to pass upon the propriety of the trial court's denial of the taxpayer's motion to open the record and receive in evidence the entire contents of the state court file, we should add that we would not hesitate to do so, if purpose were otherwise doubtful, and to conclude that the denial was "inconsist-

ent with substantial justice", within the meaning of Rule 61, F.R.Civ.Proc., 28 U.S.C.A. Oakland's memoranda, contained in that file, lend further support to our conclusion as to purpose for they state:

"The controlling issue is whether defendant (taxpayer) has complied with certain collateral covenants of the lease, such as the covenant requiring defendant 'as far as practicable and without extra expense' to plan and conduct its operations 'with a view to leaving the premises after such removal in as usable and level condition as practicable.' "
and

"In so far as plaintiff is concerned, the only issue is whether defendant has complied with the terms of the expired lease."

or under corresponding provisions in other Revenue Acts: Rassenfoss v. Commissioner, supra, (action against partnership and its two partners by one claiming to be an equal partner; settled by an agreement in compromise giving the plaintiff cash and 1.75% interest in the partnership at a future date); Hochschild v. Commissioner, 2 Cir., 161 F.2d 817, (successful defense of a stockholder's derivative suit to impress a trust upon stock held by corporation's officer and director and for damages) where the court said, at page 819:

"We cannot agree that these fees which the petitioner paid in defense of the lawsuit were any the less deductible because his liability, if proved, might have destroyed his equitable title to the stock he held. His right to keep it was certainly in issue and in that sense his title to it was defended, to be sure, but the title as such was not perfected in any way by his expenditures for legal assistance. He thereby but fended off an abortive attack upon the conduct of his business as a fiduciary and by freeing himself from liability to his corporation to account for such conduct put all of his property beyond the reach of his then accusers."

Sergievsky v. McNamara, supra, (arising out of the same controversy as Hochschild) where it was said, at pages 237–238 of 135 F.Supp.:

"Where the defense of title aspect of the litigation is of secondary importance and the primary purpose of the litigation otherwise qualifies the expense for deduction under § 23(a) (2), the total expense will be treated as deductible. * * *

"The mere fact that the plaintiff's Climax shares may have been affected by the Turner action, did not mean that the legal expenditures by plaintiff were directly for the defense of title. * * *

"In our view of the matter, plaintiff may properly claim that her legal ·expenses in the Turner action were· deductible under § 23(a) (2). The issue of title to plaintiff's Climax stock may not be said to have been 'main and primary'. It was but the 'incidental' legal offshoot of an attempt to compel plaintiff to account for some of the profits she received from stock held for the production of income."

. Lomas & Nettleton Co. v. United States, D.C., 79 F.Supp. 886, 895–896, (suit by corporation's receiver against another corporation having directors in common with it for damages arising out of defendant's purchase of plaintiff corporation's preferred shares at depressed prices); Ruoff v. Commissioner, 3 Cir., 277 F.2d 222, (action by taxpayer contesting Attorney General's seizure of her property under the Trading with the Enemy Act, 50 U.S.C.A. Appendix, § 1 et seq.); Guttmann v. United States, D.C.W.D.Pa., 181 F.Supp. 290, 293–294. (action against taxpayer and others for an accounting and recovery of profits); and Straub v. Granger, supra.[15] Our cases of Helvering v. Stormfeltz, supra, where expenses were incurred in the successful acquisition of title to property, and Addison v. Commissioner, supra, where expenses were incurred in unsuccessful defense of title, are distinguishable upon their facts. Furthermore, in Addison we recognized the distinguishing features of Rassenfoss and Hochschild.

15. See, also, Allen v. Selig, 5 Cir., 200 F. 2d 487, (suit to establish widow's ownership, prior to her husband's death, of half interest in property held in his name); Zietz, 34 T.C. (No. 37), (proceedings to attach taxpayer's property); Urquhart v. Commissioner, 3 Cir., 215 F.2d 17, 19–20; Loyd v. United States, 153 F.Supp. 416, 139 Ct.Cl. 626; Potter, 20 B.T.A. 252; Leidesdorf, 26 B. T.A. 881; Reakirt, 29 B.T.A. 1296, affirmed per curiam, 6 Cir., 84 F.2d 996; William C. Atwater & Co., 10 T.C. 218, 248; Waldheim, 25 T.C. 839, 852, affirmed on other issues, 7 Cir., 244 F.2d 1; Rowe, 24 T.C. 382; Alleghany Corporation, 28 T.C. 298.

The trial court's finding that it is impossible to determine the essential or primary purpose of the state court litigation is therefore set aside as clearly erroneous within the meaning of Rule 52(a), F.R.Civ.Proc., and under the standard enunciated by United States v. United States Gypsum Co., 333 U.S. 364, 394–395, 68 S.Ct. 525, 92 L.Ed. 746.

Reversed and remanded.